UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

FILED

2003 NOV 21 A 9: 05

US DISTRICT

| | | |
|---|---|---|
| William Connelly | : | No. 3:00cv720(JCH) |
| v. | : | |
| David Cosgrove, et al | : | |
| [Complaint Amended as to the following defendants only: Patricia Wollenhaupt, Timothy Silvis, Clerk of Court, John Does 7-11, Virginia Golemba, Mark Strange, John O'Neill, Christine Whidden, C.O.Serrano, and John Cupka, sued in individual and official capacities. | : : : : : : : : : | November 17, 2003 |

## AMENDED COMPLAINT

**Preliminary Statement.**

This is a civil rights action filed by William Connelly, a state prisoner, for damages and injunctive relief under 42 U. S. C. §§ 1983, 1985 and 1986, alleged the defendants conspired to wage a political vendetta and coverup of same in violation of the plaintiff's civil rights under the United States Constitution. The plaintiff also alleges the intentional torts of assault, defamation and invasion of privacy.

**Jurisdiction.**

1. The court has jurisdiction over the plaintiff's claims violations of federal constitutional rights under 42 U. S. C. § 1331(a) and 1343. The court also has jurisdiction pursuant to rights created under the United States Code.

2. The court has supplemental jurisdiction over the plaintiff's state law tort claims under 28 U. S. C. § 1367.

Parties.

3. The plaintiff, William Connelly, has been confined from November 10, 1989 to the present at Hartford Correctional Center (HCC), Whiting Forensic Institute (WFI), Macdougall Correctional Institution (MCI) and Greensville Correctional Center in Virginia.

4. The wrongful acts committed by the defendants named in this amended complaint occurred while the plaintiff was in the official custody of the Connecticut Department of Correction (CDOC or CT DOC) at MCI and Greensville.

5. The plaintiff is a pro se litigant.

6. Defendant Clerk of Court of the Hartford Superior Court was employed was employed by Hartford Superior Court at the time of the acts described in this complaint. I/O.

7. Defendant Virginia Golemba was a classification specialist employed by MCI at the time of the acts described in this complaint. I/O.

8. Defendant Timothy Silvis was a medical doctor employed at MCI at the time of the acts described in this complaint. I/O.

9. Defendant Patricia Wollenhaupt was a nurse employed at MCI at the time of her acts as described in this complaint. I/O.

10. Defendant John/Jane Doe#7 was a clerk in the mailroom at MCI at the time of his/her acts as described in this complaint. I/O.

11. Defendant John Doe#8 was a correctional officer at MCI at the time of his acts as described in this complaint. I/O.

12. Defendant John Doe#9 was a law clerk employed by the Connecticut Appellate Court at the time of his acts as described in this complaint. I/O.

13. Defendant John Doe#10 was a correctional officer employed by MCI at the time of his acts as described in this complaint. I/O.

14. Defendants John Does#11 were correctional officers employed at MCI at the time of their acts as described in this complaint. I/O.

15. Defendant Mark Strange was the Warden of MCI at the time of his acts and the acts of his subordinates as described in this complaint. I/O.

16. Defendant John O'Neill was a counselor/supervisor at MCI at the time of his acts as described in this complaint. I/O.

17. Defendant Christine Whidden was a correctional officer at MCI at the time of her acts as described in this complaint. I/O.

18. Defendant Officer Serrano was a correctional officer at MCI at the time of his acts as described in this complaint. I/O.

19. Defendant John Cupka is the Connecticut On-site Monitor at Greensville Correctional Center in Virginia and his acts as described in this complaint were committed in that capacity.

20. The defendants acted under color of state law and conspired to perpetuate and coverup a political vendetta/conspiracy against the plaintiff.

21. At the time of the incidents alleged in this complaint, each defendant was employed as indicated above.

22. Each defendant was aware he/she was perpetuating a political vendetta/conspiracy, pervasive and uninterrupted during the course of the plaintiff's confinement, and each allegation must be viewed in that light.

FACTS

23. The plaintiff was arrested on November 10, 1989 as a consequence of a shooting and hostage incident involving two of the plaintiff's brothers, it being well-documented in court transcripts that the plaintiff alleges the incident cannot be fully explained unless it is seen in the context of a political vendetta perpetuated against the plaintiff, the victims (brothers) being apolitical pawns in the game.

24. The political vendetta was waged by many factions including but not limited to ideological zealots in public employee agencies and unions.

25. The political vendetta/conspiracy followed the plaintiff into the facilities in which he was confined.

26. From 11/24/89 to 4/20/90 the plaintiff was confined in Hartford Correctional Center, the Hartford County pretrial detention facility, hereinafter HCC.

27. Connecticut Department of Correction (hereinafter CT DOC) at HCC planned and orchestrated a sexual assault on the plaintiff. One evening the plaintiff requested cold pills to relieve the symptoms of a severe cold. An HCC medical aide (John Doe#1) tendered pills to the plaintiff at the medication call after the third meal. Then the plaintiff returned to his cell and shut the cell door, thereby locking it. According to the information and belief of the plaintiff, the pills were not cold tablets, but instead rendered the plaintiff unconscious. According to the information and belief of the plaintiff and information offered by inmates on the block,

John Doe#2 block officer popped open the cell door by remote control and three males who were not residents of the block entered the cell. When the plaintiff regained consciousness a few hours later his anal canal was extremely sore and there was a large, wet semen-like substance on his sheet. Only the block officer could have opened the cell door. Only the block officer possessed the authority to allow three unknown persons from off the block onto the block.

28. Shortly thereafter, two inmates who had no ostensible grudge against the plaintiff jumped the plaintiff in the meal/television room; plaintiff fought them off and no physical damage was done. The incident occurred in view of John Doe#3 in the control booth.

29. Shortly thereafter, some wads of paper were set on fire and pushed under the plaintiff's locked door during a period when all inmates were supposed to be locked in their cells. Plaintiff extinguished the fire. John Doe#4 block officer should have been able to observe inmate movement during this lockdown period.

30. Shortly thereafter, John Doe#5 block officer popped open the plaintiff's cell door and two inmates initiated a physical altercation with the plaintiff; the plaintiff resisted and no physical harm was done to any party.

31. On February 5, 1990, the plaintiff was transported to G. A. 15 for a pretrial hearing. After court adjourned for the day, about ten inmates were handcuffed, shackled and attached to a common chain by the New Britain sheriffs in preparation for

6

transport back to HCC. As the plaintiff and other chained inmates negotiated the narrow staircase leading to the ground floor in the New Britain Courthouse, the inmate in front of the plaintiff slipped free of his handcuffs and the inmate behind the plaintiff pulled the plaintiff off balance so that the inmate whose hands were free could punch the plaintiff in the face. Neither inmate had been next to the plaintiff in the original alignment, but the sheriff had rearranged the order for no apparent reason. Neither inmate was known to the plaintiff and it is reasonable to infer John Doe#6 sheriff orchestrated the event. The plaintiff reported the incident to HCC officers upon his return to HCC, but nothing was done, especially when the plaintiff stated the incident seemed to be orchestrated by the sheriffs and not by inmates.

32. On April 20, 1990 the plaintiff was found not guilty by reason of insanity, Dunn, J. The diagnosis upon which the the judgment was based cited the plaintiff's allegations that he was the target of a political vendetta/conspiracy as the sole evidence the plaintiff was mentally ill. The plaintiff insisted family members involved in the incident had been manipulated by one or more perpetrators of the vendetta/conspiracy.

33. Upon arriving at Whiting Forensic Institute (hereinafter WFI), the plaintiff stated he had been misled about the NGRI proceeding, and that he was not mentally ill and would not comply with any type of psychiatric intervention.

(a) The political vendetta/conspiracy continued uninterrupted at WFI, a state institution whose employees perceived

7

perceived the plaintiff's political opinions as contrary to their best interests.

(b) After the plaintiff had been at WFI a few weeks, a medical professional informed the plaintiff that WFI would be in an adversary relationship with the plaintiff if the plaintiff continued to insist the incident for which the plaintiff was confined happened in the context of a political vendetta. When the plaintiff responded that "adversary relationship" was not medical terminology, the medical professional stated the warning was being given as a favor. The consequences of the adversary relationship were unlawful imprisonment, stigmatization of the plaintiff as mentally ill, chilling of the plaintiff's right of free expression, alienation of friends and relatives, persistent attempts to coerce the plaintiff into taking psychotropic drugs as the only way to be released; and the most damaging effect of the adversary relationship was the compilation of a spurious, mammoth body of documentation discrediting plaintiff's version of events and his mental health. The documentation influenced the PSI and sentence after the second trial and has given prison officials a cover for their wrongful acts.

(c) WFI assumed an adversary relationship **before** the plaintiff made any allegations against WFI. It is reasonable to infer WFI medical professionals and other employees were therefore motivated by ideological intolerance and/or the wish to cover for their ideological bedfellows in various government bureaucracies and elsewhere. The plaintiff has consistently

alleged the political vendetta/conspiracy predated the crime, the crime occurred in the context of the vendetta/conspiracy and and state officials have perpetuated the vendetta/conspiracy during the plaintiff's confinement.

(d) Plaintiff is/was a target of a political vendetta/conspiracy because of his perceived and actual libertarian-Republican political opinions, prior peripheral political activities and mainstream Republican affiliations.

(e) The general ideological intolerance was heightened by WFI's contract problems with the Weicker administration. Budgetary constraints inflamed the issue and intensified the scapegoating of the plaintiff.

(f) The plaintiff consistently denied he was/is politically important; scapegoats rarely are important.

(g) WFI, without the consent of the plaintiff, solicited for the record a diatribe written several years earlier by the plaintiff's ex-wife for her divorce lawyer. Contents of this document (full of fabrications, distortions and exaggerations) have in court opinions, the PSI prepared for the second trial and the plaintiff's personal DOC file. The plaintiff has reason to believe the PSI has been disseminated among inmates.

34. On August 16, 1994, the insanity acquittal was vacated, Higgins, J. On September 9, 1994, the plaintiff was transferred from WFI back to HCC to prepare for retrial. On January 26, 1995, the plaintiff was found guilty of two counts of kidnapping and two counts of assault in the second degree. On March 3, 1995, the plaintiff was sentenced to 40 years, Scheinblum, J.

9

35. Governor John Rowland took office in January of 1995, having been opposed by most public employee unions.

36. On March 14, 1995, the plaintiff was transferred to MCI where the plaintiff was confined until February 9, 2001.

37. On or about midnight, July 14/15, 1995, a cellmate of the plaintiff physically assaulted the plaintiff in their cell. The cellmate was acting on the instructions of prison officials. The plaintiff was given a Class A Fighting ticket for fighting back in self-defense. Plaintiff was put in segregation for two weeks and housed in the H-2 Disciplinary Housing Unit for about eight weeks, followed by another eight weeks on the admissions block. During this period the plaintiff was trying to obtain appellate counsel or, alternatively, standby counsel; concurrently, the plaintiff was preparing his appeal. Plaintiff was severely hampered by the circumstances and actions of prison officials, including but not limited to mail irregularities, malfunctioning typewriters, uncooperative cellmates and more limited access to the law library. When the plaintiff informed prison officials he needed to make several copies of his appellate brief, the plaintiff was told the entire facility was out of toner; although the plaintiff was informed by several inmates that copiers were working throughout the facility and plenty of toner was stocked in the main supply center. The shift supervisor during the assault noted in this paragraph encouraged the attack and tried to place the blame on the plaintiff. The attack and subsequent disciplinary housing was motivated by prison officials' hostility toward the plaintiff's libertarian Republican political beliefs and prior

affiliations and the perception those opinions were supportive of Governor Rowland. The attack was motivated by the desire to remove the plaintiff from his job on the inmate newspaper, to hinder the plaintiff's ability to prosecute his appeal and to chill the plaintiff's freedom of expression.

38. Defendant Virginia Golemba, Classification Specialist at MCI, ignored a ruling by a state habeas court that the plaintiff's early release eligibility must be determined by the statutes, rules, regulations, procedures, policies, guidelines and directives in effect on November 10, 1989, the date of the commission of the crime.

39. Defendant Timothy Silvis was a physician employed by MCI. Silvis recklessly, intentionally, maliciously and unreasonably delayed access to prostate specific antigen testing and the reporting of the results and ignored the plaintiff's request for a digital rectal exam, attempting to chill the plaintiff's freedom of expression and to retaliate for budget cuts favored by Republicans in the executive and legislative branches; thereby making a scapegoat of the plaintiff who was never politically important and is, as a convicted felon, ineligible to vote.

40. At a habeas hearing on September 29, 1999, a Records Specialist for CT DOC, testified she had no knowledge of early release eligibility laws and no knowledge of how the Board of Parole acquires early release eligibility data about inmates. This witness was the state's witness and the only early release eligibility expert to testify, because the Clerk of Court of

11

Hartford Superior Court failed to process the plaintiff's pro se subpoenas in regard to the habeas hearing of 09/29/99. The plaintiff was required to use the adversary's (CT DOC's) Records Specialist who claimed she knew nothing about early release eligibility. The plaintiff had attempted to subpoena a witness who was involved in early release programs on the date of the commission of the crime and attempted a subpoena duces tecum on CT DOC, asking for records documenting early release practices on the date of the commission of the crime. Inasmuch the plaintiff was claiming he was, in 1999, eligible for early release consideration and CT DOC was claiming the plaintiff must serve 85% of his sentence before eligibility, the difference between the two claims was 24 years. The failure of the Clerk of Court to honor the plaintiff's subpoenas severely prejudiced the plaintiff in that the plaintiff had no expert testimony to rebut the dubious testimony of the CT DOC witness. The Connecticut Office of the Attorney General represented CT DOC and acknowledged the CT DOC witness was their witness.

41. Defendant Patricia Wollenhaupt, a nurse at MCI, recklessly, intentionally, maliciously and unreasonably denied access to prostate specific antigen testing, denied access to a digital rectal exam and stated the matter was not grievable. Nurse Wollenhaupt denied the medical treatment for two years despite a grievance filed by the plaintiff (referred to Wollenhaupt by Warden Strange and decreed by Strange and Wollenhaupt as nongrievable), a letter sent to Governor Rowland and an argument between Warden Strange and the plaintiff over the letter.

Nurse Wollenhaupt was attempting to chill the plaintiff's freedom expression and retaliate for budget cuts favored by Republican in the executive and legislative branches; thereby making a scapegoat of the plaintiff.

42. John/Jane Does#7, mail clerks employed by MCI, hindered the plaintiff's access to court by mishandling his mail, often rerouting the mail to custody staff; consequently incoming and outgoing mail was occasionally delayed or confiscated. The plaintiff could not effectively prosecute his civil and/or criminal litigation under these circumstances. In addition to the denial of access to court these actions constituted, they represented another facet of the attempt to chill the plaintiff's freedom of speech and retaliate for budget cuts by making a scapegoat of the plaintiff. The harm is obvious: plaintiff lost his criminal appeal and has not been able to deter the conspirators from perpetuating the conspiracy due to adverse rulings regarding his civil rights actions.

43. Defendant John Doe#8, a correctional officer from MCI, resorted to sleep deprivation and scrambling the plaintiff's legal papers, inter alia, before the plaintiff made oral argument in the Connecticut Appellate Court on direct criminal appeal. The plaintiff performed poorly and the judgment of the trial court was affirmed.

44. Defendant John Doe#9, an Assistant Clerk employed by the Connecticut Appellate Court, required the plaintiff to file his first appellate brief in a habeas case (CV-98-059780; A. C. 19758; S. C. 16277) before the final judgment was entered by the

trial court. The plaintiff was prejudiced in that he was forced to speculate regarding the framing of the issues and the reasoning of the trial court's memorandum of decision. The plaintiff was unable to fully develop key arguments due to strict page limits on the reply brief. The trial court denied the petition challenging the 40 year sentence and the state Supreme Court affirmed. Another blatant abuse of state power in retaliation for the plaintiff's expression of opinion; another facet of the pervasive and uninterrupted stream of conspiracy.

45. On November 30, 2000, with the pro se plaintiff scheduled to make oral argument in the Connecticut Supreme Court, the plaintiff was put on the wrong transportation manifest by defendant John Doe #10, awakened at 3:00 a. m., kept on hold for 90 to 120 minutes, then sent back to his cell to await the call for the proper transportation arrangements.

46. Defendant Mark Strange, Warden at Macdougall C. I. at the time of the acts alleged, is employed by the Connecticut Department of Correction. Strange at times encouraged and at times acquiesced to the political vendetta/conspiracy against the plaintiff. Strange was aware the plaintiff's legal mail was being referred to custody staff review by the mailroom. Strange was aware the plaintiff's legal mail was occasionally confiscated by prison officials. Strange berated the plaintiff for writing to Governor John Rowland regarding the initial refusal to grant the plaintiff's request for prostate testing; then allowed medical staff to delay testing for another twelve months. The plaintiff was chemically interrogated during Strange's term as Warden. During Strange's term as Warden,

14