John Does Nos. 11 repeatedly searched the plaintiff's cell, prohibiting the plaintiff from observing the search, and several key legal documents disappeared from the plaintiff's files. During Strange's term as Warden, inmates were induced to pilfer legal documents from the plaintiff. During Strange's term as Warden, the plaintiff was declassified as a library assistant despite favorable work reports; the plaintiff was blackballed from all jobs in the school/library area of the prison. The plaintiff's son, sister and brother-in-law were delayed and/or prevented from visiting the plaintiff on separate occasions while Strange was Warden. According to the information and belief of the plaintiff, Strange retaliated against the plaintiff by sending the plaintiff to a Virginia prison.

47. Defendant Christine Whidden, a major at Macdougall, intercepted and read a complaint the plaintiff had addressed to the United States Postal Inspector, then phoned the plaintiff's block Unit Manager asking him to question the plaintiff about the matter. The plaintiff objected to the major's actions and stated she should be prosecuted. The plaintiff never received a response from the Postal Inspector. According to the information and belief of the plaintiff, Whidden routinely reviewed the plaintiff's legal mail pursuant to Strange's orders and in coordination with Counselor Supervisor John O'Neill. This action was part of a regular practice whereby the mailroom referred the plaintiff's regular and legal mail to custody staff.

48. Defendant John O'Neill, Counselor Supervisor at Macdougall,

15

was responsible for, inter alia, the library and the mailroom. O'Neill and Strange confiscated DOC Administrative Directives and rewrote them as Macdougall directives. (Not all Admin. Directives were confiscated and rewritten, only those O'Neill and Strange planned to violate.) O'Neill failed to comply with the plaintiff's requests to produce some key A. D.s. O'Neill orchestrated the incremental diminution of the legal resources in the library by: bullying and harassing the law librarian into retirement, refusing to allow purchase of updated legal resources, instituting library access procedures which mitigated against the most active pro se litigants, replacing the law librarian with whatever custody staff happened to be available at the moment, confiscating the copier in the library, confiscating the computer and its CaseBase software, and influencing the declassification of the plaintiff as library assistant. For a long period of time the plaintiff's legal mail was routinely referred to defendant O'Neill for review outside the presence of the plaintiff. Some of the plaintiff's regular and legal mail, incoming and outgoing, failed to reach the addressee.

49. Defendant Serrano, a correctional officer at Macdougall on February 9, 2001, was operating a camera on the day the plaintiff was seized to be eventually transported to Virginia. The plaintiff was ordered to remove all clothes in a cold room, ostensibly to be strip searched. Defendant Serrano filmed the strip; according to the information and belief of the plaintiff, the film has been shown to several persons for recreational purposes.

16

50. Defendant John Cupka has been the CDOC On-site Monitor at Greensville Correctional Center since the plaintiff arived on 02/14/01. Cupka is wholly or partly responsible for the confiscation of most of the plaintiff's legal papers. Cupka failed to timely place the Inmates' Legal Assistance to Prisoners telephone number on the plaintiff's PIN list; shortly after the plaintiff complained, all numbers disappeared from the list; and Cupka obstructed the plaintiff's attempts to phone an attorney in the Public Defender Habeas Unit, claiming falsely and irrelevantly that she is not a state employee. Cupka has repeatedly tried to deprive the plaintiff of Job Credit Good Time. Cupka has frequently failed to reply to the plaintiff's written inquiries. According to the information and belief of the plaintiff, Cupka is responsible for the disappearance of the habeas transcripts of 09/29/99 in which a CDOC Records Specialist offered testimony of questionable veracity. Cupka is wholly or partly responsible for the untimely delivery of plaintiff's incoming and outgoing mail; responsible for the disappearance of documents such as motions, petitions, amended complaints and court rulings and orders; responsible for rerouting an indeterminate amount of plaintiff's mail through Cupka's office in violation of VDOC and CDOC regulations and federal law. Cupka has disseminated confidential information and disinformation regarding the plaintiff among inmates and VDOC, thereby putting the plaintiff at risk; has induced cellmates and, at times, other inmates, to provoke altercations with the plaintiff and/or to confiscate or damage plaintiff's property, including legal papers; according to the information and belief of the plaintiff, defendant Cupka, through surrogates, is trying to orchestrate an incident whereby the plaintiff will be sent to disciplinary segregation or isolation. According to the information and belief of the plaintiff, Cupka or his designee(s) intercepted the Amended Complaint dated and mailed 04/14/03; subsequently, the plaintiff was chemically interrogated.

17

(a) Regarding the matter of administrative exhaustion, Cupka and VDOC have been playing the bureaucratic shell game: Cupka places responsibility on VDOC and VDOC places blame on CDOC. The only adverse party located at Greensville Correctional Center is defendant Cupka. The plaintiff has not brought any cause of action against VDOC, and VDOC has no legitimate interest in the plaintiff's litigation. The problems described by the allegations are ongoing, with defendant Cupka changing the rules as often as the plaintiff attempts administrative remedies. E. g., the plaintiff has repeatedly written letters, complaints and grievances regarding denial of Job Credit Good Time, receiving partial satisfaction, only to have Cupka and/or his designee(s) change the rules. In response to the plaintiff's attempts to exhaust administrative remedies, Cupka referred the plaintiff to the mental health unit. Cupka described the plaintiff's allegations as delusional. The numerous letters, complaints, grievances, etc. filed by the plaintiff have served notice on defendant Cupka, Interstate Compact Office and CDOC that the plaintiff is alleging the plaintiff is and has been the target of a political vendetta/conspiracy. Increasingly, Cupka is using inmates and VDOC designees to perform the wrongdoing for him. The general allegation of political vendetta/conspiracy has been raised in some of the letters, complaints and grievances so that defendant Cupka and CDOC have been given notice that the plaintiff is alleging that the wrongdoings are not discrete acts but are part of a mosaic of conspiracy.

18

(b) Regarding the matter of harm, the plaintiff has been hindered by the absence of most of his legal papers, especially, but not exclusively, those pertaining to exhaustion. Legal papers and other items have been stolen by cellmates manipulated by Cupka and those few VDOC personnel willing to do Cupka's bidding. Plaintiff was prejudiced by Cupka's handling of a Pardon Application routed through Cupka's office; pardon denied. A petition for a writ of habeas corpus challenging CDOC's calculation of early release eligibility vanished without any evidence it ever reached the state court; and the plaintiff, who is currently eligible for early release consideration, filed again several months later. Motions, amended complaints, court rulings and orders and other documents have failed to reach the Court, the plaintiff and/or the defendants in the instant case, hindering the plaintiff's prosecution of the case. Telephone numbers have been deleted from the plaintiff's PIN list or blocked from completion. When the plaintiff is faced with a court-ordered deadline, he is often harassed so as to compromise the quality of his filings. Plaintiff was prejudiced by the failure of Cupka to tender a state Supreme Court opinion affirming the plaintiff's sentence, causing the plaintiff to miss the deadline for reconsideration. Cupka has failed to ensure compliance with the VA/CT Contract regarding privileged calls to the Public Defender Habeas Corpus Unit. Cupka has put the plaintiff at risk by spreading rumors and encouraging inmates to provoke altercations by violating the plaintiff's personal and property rights. Only by thorough discovery and testimony at trial will the plaintiff have any chance to show the full extent of harm caused by defendant Cupka. The rerouting of the

19

plaintiff's mail through defendant Cupka's office remains an unresolved problem, the harm of which is self-evident.

51. Exhaustion of administrative remedies:
(a) Regarding the claim against defendant Golemba, the plaintiff made his request in writing to defendant O'Neill who delegated to defendant Whidden who delegated to defendant Golemba the claim by the plaintiff that he is eligible for early release consideration. The plaintiff thereby climbed the chain of command on a matter which is not a grievable issue according to CDOC Administrative Directives. The plaintiff attached a copy of the decision by the habeas court which ruled the plaintiff is eligible for early release consideration under the statutes and directives in effect on the date of the commission of the crime.
(b) Regarding the claims against defendant Strange, the plaintiff asks the Court to consider that defendant Strange was the arbiter, as Warden of Macdougall Correctional Institution, of grievances at the Level I stage. Warden Strange was in the informational loop as the plaintiff complained about violations of his constitutional rights as a function of a political vendetta. The plaintiff also engaged in one verbal confrontation with Warden Strange and sent memoranda and letters to Warden Strange. Governor Rowland referred a written complaint regarding prostate testing to Warden Strange; the letter and other requests for administrative relief referencing the political hostility to the plaintiff.

20

(c) Regarding the claims against defendant O'Neill, the plaintiff and O'Neill engaged in several verbal exchanges regarding the law library, mail improprieties, Administrative Directives/ Institutional Directives and grievance procedures. Defendant O'Neill handled a portfolio of responsibilities including the foregoing areas. Defendant O'Neill was the original addressee on the memorandum pertaining to early release eligibility, but delegated the decision to defendant Whidden who then delegated to defendant Golemba. Defendant O'Neill was the supervisor of mailroom and library operations and, according to the information of the plaintiff, ordered mailroom personnel to route sensitive legal mail through custody staff; i. e., incoming and out- going mail to and from the plaintiff; but the plaintiff cannot recall whether defendant O'Neill was specifically named in the numerous letters, memoranda and grievances filed regarding matters pertinent to defendant O'Neill's portfolio of responsibilities. De minimis, defendant O'Neill was aware of the plaintiff's allegations that his constitutional rights were being violated as described herein.

(d) Regarding the claim against defendant Whidden, the plaintiff attempted to file an official complaint with the United States Postal Inspector, told the Unit Manager of his block that defendant Whidden should prosecuted and objected to defendant Whidden's act in writing to defendants O'Neill and Strange.

21

(e) Regarding the claim against defendant Serrano, the picture-taking occurred as the plaintiff was being processed for transfer to Virginia. The plaintiff had no opportunity to file a grievance prior to transfer, and did not file a grievance from Virginia.

(f) Regarding the claims against defendant Cupka, see paragraph 50, supra. The plaintiff has exhausted administrative remedies through both VDOC and CDOC channels. The wrongdoing is ongoing and the plaintiff will continue to exhaust administrative remedies.

(g) Because the plaintiff has been separated from approximately 80% of his legal papers, the plaintiff will rely on discovery to prove administrative exhaustion in several instances.

## LEGAL CLAIMS

52. Paragraphs 1-51 are incorporated herein as though the same were fully set forth herein at length.

53. Each of the defendants joined in a political vendetta/conspiracy and coverup of same inspired by hostility to opinions expressed or perceived to be held by the plaintiff. The plaintiff's mainstream Republican political views (of a libertarian bent) and previous peripheral political activities led to retaliatory scapegoating by the defendants and others whom the defendants are shielding. The actions of the defendants violated the plaintiff's rights under 42 U. S. C. §§ 1983, 1985 and 1986, state tort law and federal constitutional law.

54. The defendants acted under color of state law.

55. The defendants deprived the plaintiff of rights, privileges and immunities secured by the United States Constitution, United States Code and Connecticut tort law.

### I. First Amendment.

56. Each of the defendants violated the plaintiff's rights under the First Amendment inasmuch as the common denominator of the wrongful acts is hostility to the plaintiff's political views and perceived or actual affiliations. The political vendetta/conspiracy is perpetuated by ideological intolerance and the defendants' determination to cover unlawful acts committed by their ideological brethren. The defendants' actions were not related to legitimate penological interests. The defendants' actions were and are designed to chill the plaintiff's freedom of expression, punish the plaintiff for such expression, use the

plaintiff as a scapegoat for the defendants' political frustrations, discredit the plaintiff's allegations by describing them as symptoms of mental illness, and to cover the political vendetta/conspiracy.

## II. Fourth Amendment; Presentence.

57. Fourth Amendment violations occurred between the arrest of the plaintiff on November 10, 1989 and the March 3, 1995 sentencing after the second trial. (Inapplicable to this Am. Complaint.)

## III. Fourth Amendment; Postconviction.

58. The Fourth Amendment prohibition against unreasonable search and seizure was violated by defendants Serrano, Strange, Whidden, John/Jane Doe No. 7, John Does Nos. 11 and Cupka. Each of these wrongdoers, except Cupka, was a subordinate of defendant Strange, who was Warden of Macdougall C. I. Strange knew or should have known of the wrongful acts. Defendant Cupka is liable for the Fourth Amendment violations at Greensville Correctional Center.

## IV. Right to Privacy.

59. The plaintiff has a right of privacy concerning personal information (or disinformation) under the United States Constitution, Connecticut statutes and CDOC administrative directives. This right was violated by defendants Strange, O'Neill, Serrano and Cupka. The defendants' actions, under color of state law, were intentional, reckless and malicious.

24

V. Access to Court; Fair Trial; Due Process; Fifth, Sixth and Fourteenth Amendments.

60. The plaintiff's rights of access to court, fair trial and due process were violated by defendants John Does Nos. 7-11, Clerk of Court, Golemba, Strange, O'Neill, Whidden and Cupka. The allegations in preceding paragraphs plus the anticipated fruits of discovery and trial will show the plaintiff was hindered in his prosecution of both civil and criminal matters.

VI. Equal Protection.

61. Each of the defendants violated the plaintiff's right of equal protection of the laws by singling the plaintiff out for harsher treatment because his political opinions were unpopular with government employees in general, and because of the plaintiff's actual and perceived sympathies for Governors Weiker and Rowland, and because of the defendants' intention to cover-up the the political vendetta/conspiracy.

VII. 42 U. S. C. § 1985(2).

62. Each of the defendants obstructed justice and participated in a pattern of conduct designed to intimidate the plaintiff, i. e., to dissuade the plaintiff from litigating, filing grievances and expressing his political opinions. Not only was the discrimination invidious and class-based, the defendants were also motivated by personal economic motives. The class-based invidious discrimination placed the plaintiff under physical and emotional duress, hindered his litigating in civil and criminal courts, resulted in loss of property and chilled his freedom of expression.

## VIII. 42 U. S. C. § 1985(3).

63. Each defendant, by the wrongful acts described in the preceding paragraphs, conspired for the purpose of depriving, either directly or indirectly, the Republican plaintiff of equal protection of the laws, in furtherance of the conspiracy, whereby the plaintiff was injured in his person or property and deprived of his rights as a citizen of the United States.

## IX. 42 U. S. C. § 1986.

64. Each defendant had knowledge of wrongs conspired to be done and mentioned in 42 U. S. C. § 1985, at times before and at times after they were done, had the power to prevent or aid in preventing the commission of the wrongs, and neglected or refused to do so. Each defendant is liable for the conspiracy which placed the plaintiff under physical and emotional duress, hindered his litigating in civil and criminal courts, resulted in loss of property, and chilled his freedom of expression.

## X. Assault.

65. Defendants Strange and Cupka were directly and indirectly responsible for assaults on the plaintiff.

## XI. Defamation.

66. Defendant Cupka intentionally defamed the plaintiff by describing the plaintiff as delusional and referring the plaintiff to the mental health unit in retaliation for this lawsuit and the grievances and expository memoranda filed by the plaintiff. According to the information and belief of the plaintiff, defendant Cupka has spread false rumors about the plaintiff, such being disseminated among and inmates and staff.

## DAMAGES AND RELIEF

67. By reason of the foregoing unlawful, malicious and deliberate acts, conspiracies, coverups and course of conduct of, by and among the defendants, the plaintiff has been damaged, including actual physical injury, psychological torment, deprivation of liberty, hindrance of access to courts, obstruction of justice, pain and suffering, invasion of privacy, defamation, confiscation of property, interference with the mail, loss potential earnings, loss of enjoyment of life, stigmatization and damage to reputation, loss of companionship and diminution of future employment opportunities.

68. The plaintiff asks the Court to enjoin defendant Cupka from handling the plaintiff's mail; whether privileged or regular, whether incoming or outgoing.

69. The plaintiff claims the following damages, jointly and severally, against each defendant:

(1) Compensatory damages in excess of one million dollars;

(2) Punitive damages in excess of one million dollars;

(3) Such other and further relief as this Court may deem appropriate, including costs and reasonable attorney's fees.

Respectfully submitted,

William Connelly
CT# 189009; VA# 290678
Greensville Correctional Center
901 Corrections Way
Jarratt, VA 23870

27

# APPENDIX

A. Papers filed in response to confiscation of legal papers; related to claims against John Cupka, Connecticut On-site Monitor in Virginia. Most of the missing papers pertained to wrongdoing occurring in Connecticut facilities, committed by other defendants.

B. Papers filed in response to mental health referral by defendant Cupka.

C. Papers filed in response to Job Credit Good Time denial. Some corrections have been by Interstate Compact Office, but problem is ongoing.

D. Papers filed in response to rerouting of plaintiff's mail to defendant Cupka's office. Many of the papers complaining about rerouting plaintiff's mail have disappeared from plaintiff's cell. Confer plaintiff's motion to enjoin defendant Cupka from handling plainitff's mail.

E. Papers filed in response to telephone problems.

F. Papers related to early release eligibility implicating defendants O'Neill, Whidden and Golemba.

G. Papers filed regarding mail improprieties at Macdougall prison; implicating defendants Strange and O'Neill; the legal documents in the manila legal envelope were being mailed to plaintiff's son, then a law student.

Noto bene:
   Plaintiff cannot possibly, at this stage of the proceedings, produce proof of exhaustion regarding each wrongdoing. Plaintiff has been required to send papers to third parties on the outside, some papers have been destroyed, some have vanished. Some complaints (complaints within prison context, not a pleading commencing a cause of action) and inquiries elicited no response from prison officials. Only by discovery and trial will much of the this evidence surface.

*WAC*
*11-17-03*



APX A

## Inmate Grievance Response Form
### LEVEL I

Connelly, W. 290678  
**Inmate Name and Number**

GRCC/HU7-424  
**Institution/Housing Unit**

24008833  
**Log Number**

*RECEIVED MAY 16 ... Department of Corrections Regional Director Eastern Region*

**Level I: Warden/Superintendent's Response** (to be completed and mailed within 30 calendar days)

I have reviewed your complaint alleging that you have legal papers stored in S3 personal property. You want to be assured that you can continue to store your property there and be allowed access to all legal materials beyond the amount that you can fit into the locker beneath your bunk.

DOP/IOP 856 – Inmate Personal Property pertains to your issue of complaint.

Informally, Associate Warden Millard informed you that she spoke with you on 4-20-01 in HU7. She instructed you that per Warden C. Davis, you are allowed to keep in your cell any legal paperwork that will fit neatly in your locker. You will be allowed to keep one box of legal materials in personal property storage. You need to go through your existing materials and send home all inactive material.

Further investigations reveal that in accordance with policy, IOP 856-4.0, personal property will be regulated so as to maintain security and order and so as not to interfere with safety, sanitation and health requirements. The types, value and amount of property should be limited to reduce contraband, unauthorized barter, theft and other conflict between inmates, so as not to exceed limitations on storage space, and to ensure compliance with fire, safety and sanitation requirements. Possession of personal property by inmates is discouraged. Any inmate who chooses to possess personal property while in the Department of Corrections, thereby consents to the Department's rules and policies relating to the regulation and disposition of such property. In accordance with IOP 856-7.0 #6a, any property that is determined to be excess or unauthorized during the intake process, the inmate should be given the following options to dispose of the property: 1) mail, 2) visitor pick-up, 3) donate to charity and 4) destruction of the property. It was found that you arrived at GRCC on 2-14-01 and your property was processed on 2-23-01. Per documentation, you have four (4) boxes of property in S3 Storage on a thirty (30) day hold. Personal property is to only be stored for thirty (30) days pending disposal. At the end of the 30 days, property held more than 30 days due to failure of the inmate to authorize payment to ship the property or to otherwise arrange for his property to be picked up or disposed of, shall be confiscated or converted to state ownership and disposed of by GRCC after the inmate has been given a notification of confiscation form. It is noted that you have been advised that you could sort through the property and choose what would fit into your locker and you would be allowed to store one (1) box in personal property. Upon completion of you sorting through your property to come into compliance, the remainder of your property will be sent to Maureen Briggs as you indicated on 2-23-01 on the property disposition form. Thus, there has been no violation and personal property staff will continue to ensure that all inmates are in compliance with DOP/IOP 856 relative to regulation and disposition of property.

Based on my investigation, I find that we are in compliance with DOP/IOP 856 and I rule this grievance to be **UNFOUNDED.**
abt

If you are dissatisfied with the Level 1 response, you may appeal within five working days to the Regional Director at:

Eastern Region  
Virginia Department of Corrections  
157 N. Main Street, Suite C  
Suffolk, Virginia 23434

*JUN 2 2 2001*  
*DIVISION OF OPERATION*  
*OMBUDSMAN SERVICES UNIT*

_____  
**Warden/Superintendent/Designee**

5/8/01  
**Date**

350

REGULAR GRIEVANCE FORM

DOP 866 Attachment 2
Page 1 of 2

Log # 24008833

LAST NAME: Connelly
FIRST: William
NUMBER: 290678
BUILDING: H4-7
CELL #: 424

**WHAT IS YOUR COMPLAINT?** (Provide information from the informal process: who did you see, when did you see them, what was done?)

The factual details are too numerous to fit on this form. I have, consequently, attached the following:

1. A request form of April 9, 2001 which was transformed by Warden Millard into an Informal Request. Warden Millard's response, per Warden C. Davis, is dated April 20, 2001 and appears on the bottom of the request form.

2. My memo of March 15, 2001, addressed to Warden Millard, citing case decisions from the District Court for the Eastern District of Virginia, the 4th Circuit Court of Appeals, the 2d Circuit Court of Appeals and the U.S. Supreme Court.

3. A 24 paragraph declaration of facts dated April 27, 2001.

JUN 2 2 2001
DIVISION OF OPERATION
OMBUDSMAN SERVICES UNIT

RECEIVED
MAY 16 2001
Department of Corrections
Regional Director
Eastern Region

**What action do you want taken?**

Property Room storage and reasonable access to all legal materials beyond the amount I can fit into the locker beneath my bunk.

Grievant's Signature: [signature]
Date Submitted: April 29, 2001

RECEIVED
MAY 2001
GRIEVANCE OFFICE
GREENSVILLE
CORRECTIONAL CTR.

Warden/Superintendent's Office
Date Received: 5/4/01   A. Villey

TO: W. Mulcahy, AW / Attachment I

INMATE NAME: William Connelly    DATE: April 9, 2001

Briefly state your request on this form only and address only one issue. It will be forwarded to the appropriate area for response.

NUMBER: 90678    BLDG/CELL: 7-42

MEDICAL ___ PERSONAL PROPERTY ___
UNIT MANAGER ___ BUILDING SUPERVISOR ___ MAINTENANCE ___ COUNSELOR ___
OTHER ✓

Informal Compl. # 70190

In a letter dated February 26, 2001 I addressed the issue of storage of my legal papers. Attached to the letter was an excerpt of a brief raising, inter alia, the issue of the failure of the Connecticut trial court to appoint appellate counsel. Please return the excerpt as it is my only copy. Meanwhile unit staff have assured me the legal papers will continue to be stored in this facility and will not be destroyed or mailed out.

INMATE SIGNATURE: /s/ Wm C    DATE: April 9, 2001

ACTION TAKEN/RESPONSE:

I spoke with you on 4-20-01 in HU7. I instructed you that, per Warden C. Davis, you are allowed to keep in your cell any legal paperwork that will fit neatly in your locker. You will be allowed to keep one box of legal materials in personal property storage. You need to go through your existing materials and send home all inactive material. Per our conversation, I will consider this an informal complaint.

DATE OF ACTION/RESPONSE: 4-20-01
STAFF SIGNATURE/TITLE: W. Mulcahy
Assoc. Warden

ORIGINAL TO INMATE
COPY IN HUM FILE