UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM CONNELLY | : | CIVIL NO. 3:00CV-720(JCH) |
| V. | : | |
| THERESA LANTZ | : | JUNE 25, 2007 |

### DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMARY JUDGMENT

### Introduction

The plaintiff, William Connelly, through the assistance of able and experienced counsel has filed a single count Amended Complaint, raising a claim of law which can be decided as a matter of law pursuant to a motion for summary judgment. Plaintiff alleges that because his crime was committed in 1989 he should be eligible for Supervised Home Release (SHR), a discretionary program which existed in 1989 which allowed inmates in the custody of the Commissioner of Correction, to be transferred to "an approved community residence." See Conn. Gen. Stat. §18-100(e) (rev'd 1989). The Connecticut legislature, in enacting P.A. 90-261, repealed the Commissioner's authority to place inmates in SHR after June 30, 1993. See id. §§ 2, 3(e). Public Act 90-261 also reinstated a system of parole release in Connecticut. See P.A. 90-261, §5. (copy attached) Parole for definite sentences  did not exist in 1989, when plaintiff committed his crimes. The plaintiff brings this action, not as a habeas petition, but rather pursuant to 42 U.S.C. §1983, seeking only declaratory and injunctive relief, alleging that the legislature's elimination of the SHR program violates the ex post facto clause. The defendant, Theresa C. Lantz, Commissioner of Correction, respectfully claims she is entitled to summary

judgment. For the reasons discussed below, the defendant's motion for summary judgment should be granted.

## FACTS

The plaintiff, William Connelly, is presently serving a total effective sentence of forty (40) years, imposed on March 3, 1995, for two counts of kidnapping second degree in violation of Conn. Gen. Stat, §53a-94 (15 years each), and two counts of assault second degree, Conn. Gen. Stat. §53a-60, (5 years each), which sentences were imposed to be served consecutively. Plaintiff's crimes were committed on November 10, 1989. He is presently confined at Enfield CI and his maximum release date is March 11, 2022, with a present estimated release date (as of June 21, 2007) of January 5, 2018, assuming plaintiff continues to earn statutory good time. See Steele affidavit, ¶ 5; Third Amended Complaint ("TAC") ¶ ¶4, 8, 20. Plaintiff's conviction and 40 year sentence was affirmed on direct appeal. State v. Connelly, 46 Conn. App. 486, 700 A.2d 694 (1997), cert. to appeal denied, 244 Conn. 908, 713 A.2d 829 (1998), cert. denied, 525 U.S. 907 (1998).

Plaintiff was first admitted to a Department of Correction (DOC) facility on November 13, 1989. He was held until discharged from court on April 20, 1990. Steele affidavit, ¶6. On May 18, 1990, the State of Connecticut approved Public Act 90-261, a copy of which is attached hereto. P.A. 90-261 brought back a system of parole to Connecticut for definite sentences for persons convicted of felonies and incarcerated on or after October 1, 1990.[1] On September 9,

---

[1] Initially parole was established for sentences greater than one year. Subsequent changes to the parole statute make parole presently available for sentences of two years or greater. See Conn. Gen. Stat. §54-125a(a).

1994, plaintiff was readmitted to a DOC facility. As stated above, plaintiff was sentenced to forty years on March 3, 1995.

According to the Third Amended Complaint, plaintiff has been advised in writing, in a letter written by Major Lynn Milling dated October 20, 2003, that "Since you were sentenced to a definite term of 40 years you will be eligible for parole after serving 20 years. Your parole eligibility date is November 13, 2009." TAC ¶17; Levesque affidavit ¶ 6; Steele affidavit ¶ 7. Plaintiff's parole eligibility date is November 13, 2009.

Plaintiff seeks as relief to be considered for community release "under Conn. Gen. Stat. § 18-100(e) under the rules, regulations, directives, guidelines, standards, policies and customs in effect on November 10, 1989;" See TAC at p. 6, Prayer for relief ¶2. According to the DOC Classification Manual in effect on November 10, 1989, plaintiff had to have been within 30 months of his estimated release date. See Levesque affidavit, ¶ 7. Plaintiff, under the 30 month guideline, would not be eligible for consideration for community release until July 5, 2015, and using the more liberal 1991 guideline of 36 months, would not become eligible until January 5, 2015. See Steele affidavit, ¶ 9. In 1989, the procedures for counselors in DOC for review of inmates for community release, started with a computer generated list of inmates who had 30 months or less left to serve on their sentence. See Levesque aff.¶ 9. Only inmates within that timeframe would be reviewed for other factors, such as criminal and institutional history, history of violence, etc. Id.

Today's classification policy requires an inmate to be within 18 months of the estimated release date, or July 5, 2016. Steele affidavit ¶ 8. However, if an inmate is voted to parole and given a firm voted to parole date, the DOC may consider halfway house placement 18 months

prior to a voted to parole date. See Levesque affidavit, ¶ ¶4, 13. There never has been any mandatory requirement to consider any inmate for a community release program. Levesque aff.¶ 10.  The plaintiff has an earlier chance for release to the community under the present parole scheme than he would have had  if only eligible under the statutes and rules in effect on November 10, 1989.

## SUMMARY JUDGMENT STANDARDS

Under Rule 56(c), Fed.R.Civ.P., summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law."  It has been held that summary judgment may be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and to which that party will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 538 (1986); see also, Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 568-87, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986).

When a motion for summary judgment is adequately supported by documentary exhibits, depositions, answers to interrogatories or further affidavits, it must be controverted by a similar response setting forth specific facts showing that there is a genuine issue for trial, absent which summary judgment shall be entered, if appropriate.  Foster v. Turner Broadcasting, 844 F.2d 955, 959 (2nd Cir. 1988), cert. denied, 488 U.S. 994 (1988).  In other words, there must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A party opposing summary judgment may not rely on conjecture or conclusory assertions that the other

party is not telling the truth.  See Gottlieb v. County of Orange, 84 F.3d. 511, 518 (2nd Cir. 1986). A party who opposes  summary judgment  cannot  hold back his evidence  until the time of  trial, but rather has the burden of coming forward with evidence now, or risk not having any trial.  Engl v. Aetna Life Insurance Co., 139 F.2d 469 (2d Cir. 1943). The object of  summary judgment  is "to discover whether one side has no real support for its version of the facts," Community of Roquefort v. William Faehndrich, Inc., 303 F.2d 494, 498 (2d Cir. 1962), and thereby to avoid unnecessary trials.

Summary judgment dispositions have been encouraged as a valuable means for avoiding unnecessary trials, and modern Supreme Court and Second Circuit cases have encouraged its use for that purpose.  See e.g., Celotex, supra; H.L. Hayden Co. of N.Y. v. Siemens Medical Systems, 879, F.2d 1005, 1011 (2nd Cir. 1989); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2nd Cir. (1986), cert. denied, 480 U.S. 932 (1987).  It is particularly appropriate in cases under 42 U.S.C. § 1983 involving insubstantial claims such as this case.  Harlow v. Fitzgerald, 457 U.S. 800, 816, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982).

## I.    THE  EX  POST  FACTO  CLAUSE  APPLIES  ONLY  TO LEGISLATIVE ENACTMENTS THAT INCREASE PUNISHMENT BEYOND THAT PERMITTED ON THE DATE OF THE CRIME.

Article I, § 10 of the United States Constitution forbids states from passing any "ex post facto law."  (emphasis supplied) The United States Supreme Court has interpreted this clause to prevent legislatures from "retroactively alter[ing] the definition of crimes or increas[ing] the punishment for criminal acts."  California Dept. of Corrections v. Morales, 514 U.S. 499, 115 S. Ct. 1597, 1601 (1995); Collins v. Youngblood, 497 U.S. 37, 43, 110 S. Ct. 2715 (1990).  When addressing an ex post facto challenge such as the plaintiff's, the Court must ask whether the law

"changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Id. at 42, quoting Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798).[2/] "After Collins [v. Youngblood], the focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage,' [or] affects [an individual's] 'opportunity to take advantage [of options otherwise available to him]' . . . but on whether any such change  . . . increases the penalty by which a crime is punishable." California Dept. of Corrections v. Morales, 514 U.S. 499, 115 S.Ct. 1597, 1602 n.3 (1995) (emphasis in original). In Morales, a change in California's parole eligibility waiting time was held not to violate the ex post facto clause. In Garner, the United States Supreme Court  took the opportunity in a Georgia parole case to further explore the potential ex post facto implications of delaying parole hearings for eight years as opposed to the delay not found to be ex post facto from one to three years at

---

[2] The United States Supreme Court has made it clear that only those legislative acts falling within the categories described by Justice Chase in Calder v. Bull, 3 Dall. 386 (1798), implicate the Ex Post Facto Clause:

"1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.  2d. Every law that aggravates a crime, or makes it greater than it was, when committed.  3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.  4th.  Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender." Id. at 390 (emphasis in original). Collins v. Youngblood, 497 U.S. 37, 110 S.Ct. 2715, 2719 (1990). Doe v. Pataki, 120 F.3d 1263, 1272 (2d Cir. 1997)(quoting Beazell v. Ohio, 269 U.S. 167, 169-70, 70 L. Ed. 216, 46 S. Ct. 68  (1925)) The only one of the Calder categories arguably implicated in this case is the third: whether the 1990 amendment to Conn. Gen. Stat. §18-100(e), eliminating the Commissioner's discretion to allow transfer to an approved community residence ("SHR") "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed."  See Lynce v. Mathis, 117 S.Ct. 891, 895 n.13 (1997).  The plaintiff does not argue otherwise.. A law that is merely procedural and does not increase a prisoner's punishment cannot violate the Ex Post Facto Clause even when applied retroactively. See California Dep't of Corrections v. Morales, 514 U.S. 499, 507-09, 131 L. Ed. 2d 588, 115 S. Ct. 1597 (1995).

issue in Morales.  See Garner v. Jones, 529 U.S. 244, 146 L. Ed. 2d 236, 120 S. Ct. 1362 (2000)

(denying  ex post facto  challenge to state parole regulations, brought under 42 U.S.C. § 1983, on

merits); Barna v. Travis, 239 F.3d 169 (2nd Cir. 2001) (denying due process and  ex post facto

challenge to parole denial, brought pursuant to § 1983, on merits; no Ex Post Facto Clause

violation, since a law that was merely procedural and did not increase a prisoner's punishment

could not violate the Ex Post Facto Clause, even when applied retrospectively).[3] Here, the

legislature's elimination of SHR and the re-institution of a parole release system merely changed

the procedures as to how a convicted offender might be released to the community. Rather than

be released by the Commissioner of Correction, at a date 36 months prior to the estimated release

date, parole release is possible after completion of 50% of the sentence. The paroling authority is

a panel of the Board of Pardons and Paroles. See Conn. Gen. Stat. §54-125a(a).

The plaintiff claims, in effect, that because he committed his offenses before July 1,

1993, the legislature has retrospectively lengthened his term of incarceration by applying Conn.

Gen. Stat. §18-100(e) as amended by P.A. 90-261, §2, eliminating SHR, to him.[4] The defendant

respectfully claims that the plaintiff's loss was the loss of a speculative chance at transfer to

SHR, that there never was any statutory nor policy based requirement that any inmate be

---

[3] In Morales and Garner, both California and Georgia statutes created a right to parole hearings
at certain intervals. Connecticut law provides for no such right. Baker v. Commisioner of
Correction, 281 Conn. 241, 914 A.2d 1034 (2007). Similarly, there is no mandate that the
Commissioner consider any inmate for community release under Conn. Gen. Stat. §18-100. The
language of the statute is entirely discretionary.

[4] P.A. 90-261, §3(e) states: "Notwithstanding any provision of the General Statutes, the
Commissioner of Correction shall not release from confinement any prisoner to an approved
community residence after June 30, 1993."

considered for SHR, and that the loss of SHR consideration presents an no risk of increased punishment in this case. Contrary to plaintiff's claim, the legislature clearly had the power to eliminate the Commissioner's statutory authority for placement of inmates on SHR, and to replace the entire SHR release system with a separate and independent system of parole release. Under the present statutory scheme, plaintiff is eligible for parole release when he completes 50% of his sentence, and thus, he is eligible for release to the community at an <u>earlier</u> time under the present parole scheme, than he would have been under the SHR scheme.[5] Plaintiff will become eligible for parole on November 13, 2009. See Steele affidavit, ¶ 7. Even when it existed, in its most liberal form, SHR eligibility criteria required an inmate to be within 36 months of his estimated release date. See Levesque deposition, pp. 33-35.[6] Plaintiff's eligibility date for SHR under the 36 month criteria is much later, not until January 5, 2015. See Steele affidavit, ¶ 9. Plaintiff's present estimated release date is January 5, 2018. Steele aff. ¶ 5. Thus, plaintiff is not "disadvantaged" within the meaning of the ex post facto clause by virtue of the legislative changes that eliminated SHR and reinstituted a parole release system in Connecticut.

To the extent that plaintiff complains about changes in the DOC's classification manual, with regard to changes in guidelines for classification, such guidelines are not "penal laws" or

---

[5] <u>See</u> <u>Johnson v. Commissioner</u> 258 Conn. 804; 786 A.2d 1091 (2002)(holding that 85% parole eligibility does not apply retroactively to crimes committed prior to July 1, 1996.)

[6] In 1989 the Classification manual required that an inmate be within 30 months of estimated release date. Counselors were given a list of inmates generated by the computer who had 30 months or less remaining on their sentences. These inmates were then checked for other eligibility factors. In 1991, the guidelines became more liberal and an inmate could be considered for community release if within 36 months of estimated release date. Levesque deposition pp.33-35, see also Classification manuals from 1989 and 1991.

legislative enactments within the meaning of the ex post facto clause. See <u>Beltempo v. Hadden</u>, 815 F.2d 873, 874 (2nd Cir. 1987). Parole   guidelines . . . are not "laws" within the meaning of the  ex post facto  clause." <u>DiNapoli v. Northeast Regional Parole  Commission</u>, 764 F.2d 143, 147 (2d Cir.), cert. denied, 474 U.S. 1020, 106 S. Ct. 568, 88 L. Ed. 2d 553 (1985). <u>See also</u> <u>Abed  v. Commissioner of Correction</u>, 43 Conn. App. 176, 182, 682 A.2d 558, cert. denied, 239 Conn. 937, 684 A.2d 707 (1996) denial of writ of habeas corpus aff'd sub nom <u>Abed v. Armstrong</u>, 209 F.3d 63, (2d Cir.) cert. denied 531 U.S. 897 (2000)(holding that retroactive changes in DOC directives and procedures are not laws for ex post facto purposes).

Even if the Court were to reach the merits of plaintiff's ex post facto claim, the plaintiff's claim is without any merit for this and the additional reasons discussed herein.[7] Accordingly, the defendant is entitled to judgment as a matter of law and her summary judgment motion should be granted.

**II.      THERE IS NO FEDERAL QUESTION OR RIGHT AT ISSUE IN THIS CASE**

Whatever this case may be, it certainly is not a case alleging a violation of a federally protected right. Although plaintiff appears to allege that he is denied the "right" to be considered for SHR, there never was any such "right." SHR, was a discretionary program, and there never

---

[7] In <u>Guida v. Commissioner,</u> 221 Conn. 402, 604 A.2d 356 (1992) the Connecticut Supreme Court declined to reach the merits of the ex post facto question, where, as here, the petitioner was not disadvantaged. Here, it is clear that the petitioner is rather "advantaged" by being able to be considered for parole, which did not exist at the time of his crime. The <u>Guida</u> Court, at 407 stated, "Nevertheless, we decline to resolve the question as presented in this case, where it is uncertain, and unlikely, that this petitioner, in fact, ever suffered any disadvantage by the amendment of the statute and the implementation of the new regulations."

was any requirement that any inmate be considered for such discretionary transfer to an approved community residence under Conn. Gen. Stat. §18-100(e)(rev'd 1989).[8]

### A.   There is No Constitutional Right to Compel the Commissioner to Consider Anyone for SHR

This case raises only a state law question as to the interpretation of Conn. Gen. Stat. §18-100. The Supreme Court has noted that "a  State's highest court  is the final judicial arbiter of the meaning of  state statutes." Bush v. Gore, 531 U.S. 98, 138 (2000). "The decision of the  highest court  of a  state  on matters of  state law are in general conclusive upon us." Huddleston v. Dwyer, 322 U.S. 232, 237  (1944). Just this year, the Connecticut Supreme Court again reiterated that there is no liberty interest in either parole or parole eligibility. Baker v. Commisioner of Correction,  281 Conn. 241, 914 A.2d 1034 (2007),  (there is no liberty interest in parole eligibility because such decisions are within the broad discretion of the Board.) See Missionary Society of Connecticut v. Board of Pardons & Parole, 272 Conn. 647, 652, 866 A.2d 538, 541 (2005)(citing with approval, Taylor v. Robinson, 171 Conn. 691, 697,372 A.2d 102 (1976) (there is no statutory requirement that parole board determine eligibility for parole of any particular prisoner). The Board is not compelled by any provision of state law to consider any inmate for parole, even if he is eligible under the statute. Instead, the statutory language for establishing conditions is entirely discretionary, and states, in relevant part, that "**At the discretion of the panel**, **and under the  terms and conditions as may be prescribed by the panel** including

---

[8] P.A. 90-261 amended Subsec. (e) to eliminate the authority of the commissioner to transfer an inmate to an approved community residence and the provision that personnel of the department of correction will supervise such inmate, effective July 1, 1993. The relevant administrative directive, policy and/or statute are set out in Guida v. Commissioner of Correction, 221 Conn. 402,  604 A.2d 356 (1992). See also P.A. 90-261 attached hereto.

requiring the parolee to submit personal reports, the parolee shall be allowed to return to the parolee's home or to reside in a residential community center, or to go elsewhere." Conn. Gen. Stat. §54-125, §54-125a(a)(emphasis added).

There is not now, nor was there ever any requirement under any section of the General Statutes of Connecticut or under state regulations that the Commissioner of Correction was required to consider any inmate for transfer to an approved community residence (SHR), a community release program which is entitled to less protection than parole. Moreover, this is a state law question, not a matter of federal law. Plaintiff does not claim that there is any federal statutory or constitutional requirement for a state to have a parole or SHR system, nor is there any federal requirement for any state to adopt a state parole system or a system of community corrections whereby inmates can serve their sentences in either halfway houses or private "approved" community residences. See discussion below, at 7-8, citing, <u>Greenholtz v. Nebraska Penal Inmates</u>, 442 U.S. 1 (1979).

With regard to parole, neither Conn. Gen. Stat. §54-125 nor §54-125a(a) "does not give an inmate any right to demand or even apply for parole. It does not require that a parole board actually consider any inmate's eligibility for parole, even if he has fulfilled the statute's two requirements." <u>Taylor v. Robinson</u>, 171 Conn. 691, 697-98, 372 A.2d 102 (1976); <u>Vincenzo v. Warden</u>, 26 Conn. App. 132, 141-142, 599 A.2d 31 (1991). (holding that Connecticut's parole statutes do not create any protected constitutional or statutory liberty interest in parole release). <u>See also</u>, <u>Baker</u>, 281 Conn. 241, <u>supra</u> (adopting the rationale of <u>Vincenzo</u> and rejecting due process claims).

In   Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 99 S. Ct. 2100, 60 L. Ed. 2d 668

(1979),  the Supreme Court rejected the claim that there is a constitutional right to parole, stating:

> There is no constitutional or inherent right of a convicted person to be
> conditionally released before the expiration of a valid sentence.

Greenholtz, 442 U.S at 6-7. The Greenholtz Court, relying on Board of Regents v. Roth, stated:

> "[To] determine whether due process requirements apply in the first place, we
> must look not to the 'weight' but to the nature of the interest at stake."   Board of
> Regents v. Roth, 408 U.S. 564, 570-571 (1972)….
>
> "A person clearly must have more than an abstract need or desire for it.  He must
> have more than a unilateral expectation of it.  He must, instead,  have a legitimate
> claim of entitlement to it."  Id., at 577.

With regard to SHR, no case has held that Connecticut's discretionary work or education

release statute, Conn. Gen. Stat. §18-100,  creates either a property or a liberty interest. To the

contrary, the mere existence of such discretionary language dispels any notion of entitlement,

and even when the statute was in existence   in 1989 created nothing more than the mere

speculation that one might be given consideration for SHR.

Asherman v. Meachum, 213 Conn. 38, 566 A.2d 663 (1989) held that a prisoner has no

constitutionally derived liberty interest in  SHR.   In so ruling, the Connecticut Supreme Court

determined that  SHR  involves a lesser  interest and deserves less due process protection  than

parole release, noting that the status of a person on  SHR  closely resembles that of a person

confined in a minimum security correctional institution, as he remains under the supervision of

the department, similar to any incarcerated inmate, and absconding constitutes the' new crime of

escape.  Id., 213 Conn. at  48. Although the Connecticut Supreme Court in  Asherman left open

the question of whether  SHR  implicates a statutorily created liberty interest,  this question was

decided in the negative by  Judge Burns in the District Court in the federal habeas sequel.

<u>Asherman v. Meachum</u>, 2:90CV007(EBB)(D. Conn. Oct. 24, 1990), reversed on other grounds 957 F.2d 978, (2nd Cir. 1992)(en banc). The District Court's reasoning, focusing on the statutory discretion afforded to the department in  SHR revocation, is equally persuasive in connection with the statutory discretion afforded to the department in granting  SHR. See <u>Asherman v. Meachum</u>, 2:90CV007(EBB), slip opinion at 10 (petitioner did not have a liberty interest in remaining on SHR)(copy attached).  It was on the ground of this discretion that <u>Smith v. Liburdi,</u> 26 Conn. App. 254, 258-59 600 A.2d 17 (1991), held that there is no constitutional or statutory entitlement to  SHR  sufficient to involve due process.

In rejecting a claim of a "liberty interest" in parole eligibility, the Connecticut Supreme Court recently reaffirmed in  <u>Baker</u>, and stated by the <u>Vincenzo</u> Court, 26 Conn. App at 141:

> Our statute contains no language providing that an inmate shall be released if the two statutory criteria are met.  It vests broad discretion in the judgment of the parole board. The statute does not give an inmate any right to demand or even apply for parole.

Similarly, Connecticut's work and education release statute, Conn. Gen. Stat. §18-100, contains no language creating a right enforceable in federal court.[9] <u>See e.g</u>. <u>Wylie v. Warden</u>, 1992 Conn. Super. LEXIS 2277 (Conn. Super. Ct. July 24, 1992) ("a transfer to SHR is merely a transfer of a sentenced prisoner from one place of confinement to another which carries with it

---

[9] Of course, plaintiff will point out that for purposes of an ex post facto analysis, there is no requirement that there be a liberty interest or any other vested right. See <u>Weaver v. Graham</u>, 450 U.S. 24, 29-30 (1981)  However, it simply makes no practical difference and no common sense for the District Court to rule that the Commissioner has discretion to transfer the plaintiff to SHR, a program which no longer exists. Even under the then existing statute, the Commissioner or her designee could completely lawfully decline to ever consider plaintiff for SHR and such  decision in no way increases the length of plaintiff's 40 year sentence.

no constitutional or statutory liberty interest."); see also Schildge v. Commissioner of Correction,

1991 Conn. Super. LEXIS 1802 (Conn. Super Ct. July 31, 1991)(Rejecting ex post facto claim)

In Schildge, the state habeas court, after finding that the eligibility restrictions on SHR

were retroactive, concluded that there was no increase in punishment, stating:

> The second requirement for an act to violate the ex post facto prohibition is that
> it must disadvantage the offender affected by it. The statute in question does not
> increase the punishment for which the petitioner is eligible as a result of its
> conviction. It does not make more burdensome the punishment for a crime. It
> merely affects where the petitioner may not be placed in serving his sentence.
> The so called supervised home release program statute specifically provides that:
>
> "Any inmate so transferred shall remain under the jurisdiction of said
> commissioner. Any inmate transferred to an approved community residence shall
> also be subject to specifically prescribed supervision by personnel of the
> Department of Correction until his definite or indeterminate sentence is
> completed."
>
> An inmate who is in supervised home release remains in the custody and control
> of the Commissioner. This court therefore concludes that the statute in question
> does not disadvantage the petitioner and therefore does not violate the ex post
> facto prohibition.

Thus, because there is no increase in punishment, and there is no disadvantage to plaintiff

in this case, where plaintiff will be eligible for parole in November 2009, six years before he

might have been eligible for SHR if SHR continued to exist, there is no factual basis for an ex

post facto violation, and the Commissioner's summary judgment motion should be granted.

### B.    There Is No Right To Serve One's Sentence In Any Particular Location

An inmate has no justifiable expectation, enforceable right or entitlement that he will be

incarcerated in any particular prison within a state so as to implicate the Due Process Clause

when an intrastate prison transfer is made, Meachum v. Fano, 427 U.S. 215 (1976); Montanye

v. Haymes, 427 U.S. 236 (1976). Similarly, plaintiff has no justifiable expectation that he will

14

be incarcerated in any particular state. Olim v. Wakinekona, 461 U.S. 238 (1983). Indeed, in his

Third Amended Complaint plaintiff even alleges that during the course of his incarceration he

had been transferred on February 9, 2001 to the Greensville Correctional Center in Virginia,

although he remained in the custody of the Connecticut Commissioner of Correction. TAC ¶

¶13, 14. Plaintiff has no right to serve his sentence in any particular location or at any particular

classification level.

In Olim, a case which involved the transfer of a Hawaii state prisoner to a state facility

in California, the United States Supreme Court stated:

> Confinement in another State, unlike confinement in a mental institution, is
> "within the normal limits or range of custody which the conviction has authorized
> the State to impose." Meachum, 427 U.S., at 225. Even when, as here, the
> transfer involves long distances and an ocean crossing, the confinement remains
> within constitutional limits. The difference between such a transfer and an
> intrastate or interstate transfer of shorter distance is a matter of degree, not of
> kind, instructs that "the determining factor is the nature of the interest involved
> rather than its weight." 427 U.S., at 224. The reasoning of Meachum and
> Montanye compels the conclusion that an interstate prison transfer, including one
> from Hawaii to California, does not deprive an inmate of any liberty interest
> protected by the Due Process Clause in and of itself.

Olim, 461 U.S at 247-248, 103 S.Ct at 1746-47.

The United Stated Supreme Court has established a "minimum intrusion" policy into the

decisions of State prison administrators that provides these officials with wide discretion in the

operation of prisons, including developing classification guidelines. Procunier v. Martinez, 416

U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). See also Washington v. Meachum, 238 Conn.

692, 733 (1995) (citing Procunier and admonishing judges from micromanaging state state's

prison system). In Connecticut, the Commissioner of Correction has broad discretion to establish

and administer the classification of inmates confined in her custody. Conn. Gen. Stat. §18-81.

See Wheway v. Warden, 215 Conn. 418, 431-432, 576 A.2d 494 (1990).   It is well established that prisoners have no constitutionally protected interest or federally protected right in their classification.  See Pugliese v. Nelson, 617 F.2d 916 (2d Cir. 1980); see also Abed v. Armstrong, 209 F.3rd 63, at 67.  In Torres v. Howell, 3:03cv2227 (MRK)(WIG), 2006 U.S. Dist. LEXIS 38568, at *46-*47 (D. Conn. May 30, 2006) this Court stated,

> In Connecticut, an inmate has no protected right to a particular classification level. Instead, "the Commissioner of Correction retains discretionary authority to classify prisoners at any security level." Harris, 389 F. Supp. 2d at 441; see Conn. Gen. Stat. § 18-81 ("The[C]ommissioner [of Correction] shall be responsible for establishing . . .classification . . . programs throughout the department."). Therefore, the improper classification of inmates in the custody of the Connecticut Department of Correction does not implicate the inmates' due process rights. See Harris, 389 F. Supp. 2d at 441; see also Green v. Armstrong, No. 3:96cv1127, slip op. at 10 (D. Conn. Feb. 25, 1998), aff'd, No. 98-3707, 1999 U.S.App. LEXIS 20207 (Aug. 20, 1999) (summary order).

As a result, plaintiff's claim that he should be considered for  classification to risk level one, and be placed in a community release program cannot form a basis for a section 1983 claim based on his allegedly improper inmate classification. A change in classification policies or procedures cannot as a matter of law constitute a basis for an ex post facto claim. It is well established that such procedural guidelines are not "laws" for ex post facto purposes. Accordingly, the Commissioner's motion for summary judgment should be granted for these additional reasons.

**III.    PLAINTIFF'S CLAIMS ARE BARRED BY PENNHURST**

The federal courts are courts of limited jurisdiction, and this Court lacks subject matter jurisdiction to decide questions which are based solely on state law. The Supreme Court has, on more than one occasion, described the Eleventh Amendment as a "jurisdictional bar," Seminole Tribe v. Florida, 517 U.S. 44, 73 (1996);  Pennhurst  State Sch. & Hosp. v. Halderman, 465 U.S.

89, 100 (1984), and has stated that "the principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III," <u>Pennhurst  State Sch. & Hosp. v. Halderman,</u> 465 U.S. at 98.("<u>Pennhurst</u>"). In <u>Pennhurst</u> at 106, the Court stated,

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

Where a decision is to be made on the basis of  state law,  however, the Supreme Court has long shown a strong preference that the controlling interpretation of the relevant statute be given by state, rather than federal, courts. <u>See</u>, <u>e.g.</u>, <u>Arizonans for Official English v. Arizona,</u> 520 U.S. 43, 76(1997) (noting the advantage of "placing  state-law  questions in [state] courts [which are] equipped to rule authoritatively on them"); <u>Lehman Bros. v. Schein,</u> 416 U.S. 386, 391(1974) (remarking that, with respect to  state law,  the federal courts act "as 'outsiders' lacking the common exposure to local law which comes from sitting in the jurisdiction").

This preference is rooted in basic principles of federalism, for a federal court "risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court." <u>Arizonans</u>, 520 U.S. at 79; <u>see also</u> <u>In re Joint Eastern and Southern District Asbestos Litigation</u>, 78 F.3d 764, 776 (2d Cir. 1996) (taking note of the "serious disruption by federal courts of state government or needless friction between state and federal authorities that could arise when a federal court decided issues that normally turn on legislation with much local variation interpreted in local settings") (internal quotation marks omitted). As noted below, the Supreme Court refused to establish a national code of parole procedure in <u>Morrissey v. Brewer</u>, 408 U.S. 471 (1972). Instead, the Court merely described what minimal

process procedures are due under the federal constitution, and totally abstained from intruding on the states with regard to what additional procedures the states might choose or not choose to employ with regard to their respective state systems of parole. It is well established federal jurisdictional law, that a plaintiff is precluded from bringing a claim in federal court, as this plaintiff does, solely predicated on state law. See e.g. N.Y. State NOW v. Pataki, 261 F.3d 156, 167 n.2 (2nd Cir. 2001)(plaintiffs indeed would be precluded from raising a state law claim in federal court under the Eleventh Amendment, see Pennhurst, 465 U.S. 89, 104-05).

Here, there could be no greater intrusion on state sovereignty, and an affront to the state legislature, than having a federal district court issue injunctive relief ordering a state official to utilize a state statute that has been repealed more than ten years ago. This presents a classic case of the kind of injunctive relief barred by Pennhurst. For this additional reason, the defendant's motion for summary judgment should be granted.

## IV.  PLAINTIFF'S CLAIM HAS BEEN MADE MOOT BY INTERVENING EVENTS

A case becomes moot when it no longer satisfies the "case-or-controversy" requirement of Article III, Section 2 of the Constitution. See     Spencer v. Kemna, 523 U.S. 1, 7 (1998). In order to satisfy this requirement, the plaintiff must, at all stages of the litigation, have suffered, or be threatened with, an actual injury which is likely to be redressed by a favorable judicial decision. See id. Here, plaintiff alleges in his Amended Complaint that the Commissioner should consider him for a defunct program which no longer exists, SHR. To the extent that he might become eligible for parole at 50% or a community release (halfway house) program in the more distant future,  and be denied parole or such halfway house placement, such a remote and speculative injury does not give rise to an actual injury sufficient to invoke the Article III

18

jurisdiction of this court. A case becomes moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur. See County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S. Ct. 1379, 1383, 59 L. Ed. 2d 642 (1979); Martin-Trigona v. Shiff, 702 F.2d 380, 386 (2d Cir. 1983). "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." Now that plaintiff is eligible for parole, it appears that the need to consider him for SHR, a program which does not presently exist is no longer needed. See Wylie v. Warden, 33 Conn. App. 902; 632 A.2d 1133 (1993). In Wylie, the Connecticut Appellate Court stated,

> Since there is no longer any authority for the commissioner of correction to release any prisoner from confinement to an approved community residence, this court can no longer grant the petitioners any practical relief. "It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow." (Internal quotation marks omitted.) Shays v. Local Grievance Committee, 197 Conn. 566, 571, 499 A.2d 1158 (1985).

This action has become moot by virtue of the elimination of the SHR program. Article III of the United States Constitution limits this court's jurisdiction to live cases or controversies. U.S. Const. art. III, § 2; In re Kurtzman, 194 F.3d 54, 58(2d Cir. 1999) (per curiam). "If an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal must be dismissed [as moot] by virtue of Article III's 'case or controversy' requirement." In re Chateaugay Corp., 10 F.3d 944, 949 (2d Cir. 1993) (internal quotation marks omitted). Whether or not the ex post question is resolved

will not have any effect on plaintiff one way or the other, as a practical matter. Plaintiff's legal

question is purely academic and does not create any case or controversy between the parties.

## V.    PLAINTIFF LACKS STANDING FOR AN INJUNCTION

In <u>Los Angeles v. Lyons</u>, 461 U.S. 95, 101, 103 S. Ct. 1660, 1665,  75 L. Ed. 2d 675

(1983) the United States Supreme Court found there was a lack of standing and refused to

consider the grant of injunctive relief to bar the Los Angeles Police Department from using

chokeholds because the threat of future choke holds was remote and speculative. Any possible

future chokehold would depend on the remote circumstance of the plaintiff being arrested again

and again being subjected to a choke hold.  In <u>O'Shea v. Littleton</u>, 414 U.S. 488 (1974),  the

Supreme Court dealt with a case brought by a class of plaintiffs claiming that they had been

subjected to discriminatory enforcement of the criminal law. The Court held that the plaintiff's

lacked standing due to the remote and speculative nature of their injury, which again depended in

being arrested in the future. The Court in <u>O'Shea v. Littleton</u>,   stated:

> [T]he prospect of future injury rested "on the likelihood that [plaintiffs] will again
> be arrested for and charged with violations of the criminal law and will again be
> subjected to bond proceedings, trial, or sentencing before petitioners." Ibid.  The
> most that could be said for plaintiffs' standing was "that if [plaintiffs] proceed to
> violate an unchallenged law and if they are charged, held to answer, and tried in
> any proceedings before petitioners, they will be subjected to the discriminatory
> practices  that petitioners are alleged to have followed." <u>Id</u>., at 497. We could not
> find a case or controversy in those circumstances: the threat to the plaintiffs was
> not "sufficiently real and  immediate  to show an existing controversy simply
> because they anticipate violating lawful criminal statutes and being tried for their
> offenses. . . ."   <u>Id</u>., at 496. It was to be assumed that "[plaintiffs] will conduct
> their activities within the law and so avoid prosecution and conviction as well as
> exposure to the challenged course of conduct said to be followed by petitioners."
> <u>Id</u>., at 497.

The plaintiff must  show that he "has sustained or is immediately in danger of sustaining

some direct injury" as the result of the challenged official conduct and the injury or threat of

injury must be both "real and immediate," not "conjectural" or "hypothetical." See, e. g., Golden v. Zwickler, 394 U.S. 103, 109-110 (1969)(other citations omitted). The requirement that an inmate alleging a constitutional ex post facto violation must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. See Lewis v. Casey, 518 U.S. 343, 349 (1996). Plaintiff appears to claim, without any actual injury caused by the failure to consider him for SHR that "no actual or imminent harm were needed, but merely the status of being subject to a governmental institution that was not organized or managed properly." Id. 518 U.S. at 350. Plaintiff has no standing to raise his claims here because he lacks a factual basis for an ex post facto federal question and he lacks any actual injury.

Indeed, as plaintiff's Department of Correction records show, plaintiff was not even sentenced to 40 years until March 3, 1995. See Steele affidavit, ¶5 and mittimus attached thereto. Plaintiff was not in DOC custody at any time when he discharged from court on April 20, 1990, and he returned to DOC custody as an unsentenced inmate on September 9, 1994, after the elimination of SHR. Thus, plaintiff was on notice when he went to trial and was sentenced on March 3, 1995, that the Commissioner no longer had authority to place any inmate in an approved community residence. Inmates were not even reviewed for community release in 1995 unless they received sentences of two years or less. See Conn. Gen. Stat. §18-100c. Plaintiff, having received a sentence of greater than two years, became parole eligible at 50% of his sentence. Plaintiff lacks standing to assert any claims as to SHR because he was not even in the defendant Commissioner's custody at the time when SHR was eliminated, and he in fact benefited from the re-institution of parole.

Plaintiff's motion for an injunction should be denied because he seeks an injunction against future, remote and speculative injury. It cannot be presumed that plaintiff would ever have been considered for SHR, even at 30 or 36 months prior to estimated release date, and he does not have any actual injury at present sufficient to give him standing.

## CONCLUSION

For all of the foregoing reasons, the Court should grant the defendant's motion for summary judgment..

DEFENDANT
Theresa Lantz

RICHARD BLUMENTHAL
ATTORNEY GENERAL


BY:     __/s/_____
        Steven R. Strom
        Assistant Attorney General
        110 Sherman Street
        Hartford, CT  06105
        Federal Bar #ct 01211
        E-Mail:  steven.strom@po.state.ct.us
        Tel.: (860) 808-5450
        Fax (860) 808-5591

## **CERTIFICATION**

I hereby certify that a copy of the foregoing  was mailed to the following on this the 25th

day of  June,  2007:

      Jonathan B. Tropp
      William C. Mercer
      Day, Berry & Howard LLP
      One Canterbury Green
      Stamford, CT 06901-2047

                                      ___/s/_____
                                        Steven R. Strom
                                        Assistant Attorney General