## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| WILLIAM CONNELLY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:00-CV-720(JCH) |
| | ) | |
| THERESA C. LANTZ, Commissioner of | ) | |
| the Connecticut Department of Correction, | ) | |
| Defendant. | ) | September 6, 2007 |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Pursuant to 42 U.S.C. § 1983, plaintiff, William Connelly ("Connelly"), a state prison inmate, seeks (1) a declaration that Section 3(e) of Public Act 90-261 (the "Act"), as applied adversely to him, is unconstitutional under Article I, Section 10 of the United States Constitution ("No State shall … pass any … ex post facto Law…")(the "Ex Post Facto Clause"); and (2) an injunction directing Commissioner Lantz (the "Commissioner") to consider Connelly's application for early release under Conn. Gen. Stat. § 18-100(e) under the rules, regulations, directives, guidelines, standards, policies and customs in effect on the date of his offense, November 10, 1989.  The portion of the Act providing that "the Commissioner of Correction shall not release from confinement any prisoner to an approved community residence after June 30, 1993" is unconstitutional as applied to Connelly because it retrospectively increases the amount of time he must

ORAL ARGUMENT REQUESTED

serve for events occurring before its enactment before being considered for release to the community.

There is a genuine dispute whether the Commissioner would exercise her discretion to release Connelly pursuant to § 18-100(e) if that authority were restored to her. Notwithstanding the eligibility criteria relied on by the Commissioner in her brief, if Section 3(e) of the Act were declared unconstitutional as applied, Connelly *would* be eligible for release consideration because the criteria were frequently honored in the breach. Indeed, contrary to the Commissioner's moving papers, the Commissioner has expressly allowed the possibility that she would consider Connelly for release. (See Tr. of Dep. of Theresa Lantz (hereinafter "Lantz Dep.") at 48.) Accordingly, her motion for summary judgment should be denied.

## FACTUAL BACKGROUND

A.    *Connelly's Incarceration*

Connelly is a 64-year old, college educated, combat veteran. In 1994, Connelly, who had no prior record, was convicted on two counts each of kidnapping in the second degree and assault in the second degree related to a single incident that took place on November 10, 1989 involving his two brothers.[1] He was sentenced to 15 years on each of the kidnapping offenses and 5 years on each of the assaults. These sentences, totaling 40 years, are being served consecutively rather than concurrently (or Connelly would have been released from prison long ago). Connelly is presently incarcerated at Enfield

---

[1] Connelly was convicted following the vacation, on his motion, of a judgment of not guilty by reason of insanity pursuant to which Connelly had spent several years at Whiting Forensic Institute. By order of the Connecticut Supreme Court, Connelly's time at Whiting was credited against his sentence. See Connelly v. Comm'r, 258 Conn. 394 (2001).

71406066.4

Correctional Center. Though Connelly's maximum release date is March 11, 2022, his estimated release date is January 5, 2018, and he is presently eligible for parole on November 13, 2009.

Connelly has been close to an ideal inmate. He has had few disciplinary issues, and none within the last few years.

B.    *Connelly's Eligibility for the Community Release Program*

In November 1989, when Connelly committed the crimes for which he is incarcerated, the Department of Corrections ("DOC") routinely released inmates to the community before their sentences expired under the provisions of Conn. Gen. Stat. § 18-100(e)(1989):

> If the commissioner of correction deems that the purposes of this section may thus be more effectively carried out, he may transfer any person from one correctional institution to another or to any public or private nonprofit halfway house, group home or mental health facility, or to an approved community residence with the concurrence of the warden, superintendent or person in charge of the facility to which said person is being transferred. Any inmate so transferred shall remain in the jurisdiction of the commissioner. Any inmate transferred to an approved community residence shall also be subject to specifically prescribed supervision of the department of correction until his definite or indeterminate sentence is completed.

Id. Under the community release program, inmates were permitted to serve up to the remainder of their sentences outside of correctional facilities, while remaining in the legal custody of the Commissioner. Id. Community release programs included (in order of decreasing supervision): inpatient facilities, halfway houses, home arrest, electronic monitoring, intensive supervised home release, and supervised home release. (Department of Correction Classification Manual (August 1989) ("Classification Manual") at 35.)

71406066.4

Under Conn. Gen. Stat. § 18-100(e), as in effect in 1989, inmates qualified for community release if they met certain eligibility criteria[2] identified in the then-effective Classification Manual and abided by certain rules after release. (Classification Manual at 34-35.) According to the Classification Manual, an inmate was eligible for community release if he had:  served at least 10% of his sentence, no "A" disciplinary reports for 120 days, no "B" disciplinary reports within 90 days, no community release violations in the prior year, no escapes for two years, and less than 30 months remaining until his estimated release date. (Classification Manual at 34-35.)[3]  There is no dispute that Connelly meets all of the eligibility criteria except the criterion calling for him to be within 30 months of his estimated release date.[4]  There is a genuine dispute whether any of these criteria, including the 30-months criterion, was a requirement.

C.    *The Community Release Program in Operation*

Consistent with a general philosophy of utilizing community release to the fullest extent possible, in the final years of the community release program, from 1989 to 1993, thousands of inmates were released to the community, as follows (measured on July 1 of each year):

---

[2] Additional "suitability" criteria included:  disciplinary history, prior community release failures, and overall institutional adjustment at a facility. (Tr. of Dep. of Fred Levesque at 17).  There is no dispute that Connelly is suitable for release if he is eligible.

[3] The time-to-release criterion was liberalized over time.  Before August 1989, an inmate was required to be within 24 months of his estimated release date.  By 1991, the requirement had been relaxed to 36 months.  At the time of Connelly's offense, however, the time was 30 months.

[4] The Classification Manual specifically provided that the 30 month to release criteria could be overridden for individual inmates by wardens or the commissioner. (Tr. of Dep. of Fred Levesque at 34-5.)

71406066 4

| Year | Community Release Population |
|------|-----------------------------|
| 1989 | 3587 |
| 1990 | 5617 |
| 1991 | 5789 |
| 1992 | 4856 |
| 1993 | 3832 |

(Aff. of Pei Ti Lee ("Lee Aff."), Table A.)

The only way to determine how many of these inmates were released to the community despite failing to meet the DOC's written eligibility criteria is by manual review of individual inmate files. (See Lee Aff. ¶ 6.) Because the Commissioner has refused to undertake this task on a comprehensive basis, the complete answer is not known. Anecdotally, however, community release eligibility criteria were frequently waived. For example, out of 10 inmates[5] whose files were individually reviewed by the Commissioner (representing but a tiny fraction of the total community release population), fully 70% (7) were released despite failing to meet one or more of the DOC eligibility criteria: 5 inmates (Atkinson, Deptula, Strickland, Tatum and Whitfield) were released despite failing the disciplinary report eligibility criteria; 4 inmates (Deptula, Jemison, Tatum, and Setzer) were released even though they committed crimes while previously released to the community; 2 inmates were released despite failing the escape criterion (Jemison and Setzer), and 1 inmate (Setzer) was released to the community on three separate occasions when he was not within the time-to-release window. (See Tropp Aff. Exs. A-J.)

---

[5] Tim Whitfield, Tatem Darnell, Darryl Atkinson, Richard Bember, Paul Deptula, Steven Asherman, Henry Jamison, Russell Manfredi, Daryl Setzer, and Mark Strickland. Pertinent excerpts of the prison records for each of these inmates are attached to the accompanying Affidavit of Jonathan B. Tropp.

71406066.4

Indeed, directly contrary to a key factual assertion in the Commissioner's moving papers, including supporting affidavits, Mr. Setzer was released in April 1989 with approximately 36 months left in his sentence (when the criterion was that he be within 24 months of release); returned with new charges in September 1989 and released again two days later with still approximately 31 months left (when the criterion was 30 months); and returned again with new charges three weeks later only to be released again in February 1990, now with 32 months left in his sentence as a result of the additional charges (when the criterion was still 30 months). Thus, contrary to the Commissioner's moving papers, the only eligibility "requirement" that Connelly fails to meet was waived on at least three occasions within even a very finite sample.

One inmate (of the 10) who appears only to have been released within the community release criteria is nevertheless worth special mention. Asherman "was convicted of manslaughter in the first degree in 1980 ... after being found guilty of committing a particularly brutal crime, one in which the victim was stabbed over 100 times. He was sentenced to seven to 14 years imprisonment, and ... began serving his sentence on March 19, 1985. Thirty-three months later in December 1987, the Commissioner [Meachum] approved Asherman's application for community release...." Asherman v. Meachum, 932 F.2d 137, 139 (2d Cir. 1991).[6] Asherman was first placed in a halfway house and then in March 1988 placed in supervised home release. Id. In July, his application for parole was denied by the Parole Board, which cited "the seriousness of the crime for which Asherman had been convicted, and its findings that there was 'no reasonable probability' that he could remain at liberty without violating the law and his

---

[6] Asherman "met" the time-to-release criterion only because he received more than 2.5 years of "good time" credit before he was even incarcerated.

release would be incompatible with the public's welfare." Id. (After a court battle, Asherman ultimately remained in the community. Id. at 147.)

In addition to this anecdotal evidence, it is undisputed that the DOC waived at least some of the eligibility criteria across the entire prison population from time to time. (Tr. of Dep. of Fred Levesque at 22.)

D.    *The End of Community Release Discretion*

In 1990, the Connecticut Legislature passed the Act, which, *inter alia*, restricted the ability of the Commissioner to place inmates in approved community residences between 1991 and June 30, 1993, and eliminated community release authority effective July 1, 1993. In pertinent part, the Act provided:

> (b) Except as provided in Subsection (d) of this Section, the Commissioner of Correction shall not release from confinement to an approved community residence pursuant to subsection (e) of Section 18-100, as amended by Section 1 of Public Act 89-383, any prisoner who is convicted and incarcerated for an offense which occurs on or after October 1, 1991, unless such prisoner has served at least twenty-five percent of the definite sentence imposed.

> (c) Except as provided in Subsection (d) of this Section, the Commissioner of Correction shall not release from confinement to an approved community residence pursuant to subsection (e) of Section 18-100, as amended by Section 1 of Public Act 89-383, any prisoner who is convicted and incarcerated for an offense which occurs on or after October 1, 1992, unless such prisoner has served at least forty percent of the definite sentence imposed.

> * * * * * *

> (e) Notwithstanding any provision of the General Statutes, the Commissioner of Correction shall not release from confinement any prisoner to an approved community residence after June 30, 1993.

Public Act 90-261, Section 3. Notably, sections 3(b) and (c) of the Act showed sensitivity to the Ex Post Facto Clause, but section 3(e), which is at issue in this case, purported to apply to all prisoners irrespective of the dates of their offenses.

-7-

71406066.4

In support of the passage of the Act, then-Senator Blumenthal stated that the bill "makes major changes in a number of corrections programs that have been the subject of discussion during the recent sessions" of the Connecticut Senate, including the "eliminat[ion of] the supervised home release program" and "the provi[sion] that more serious offenders, that is those serving one year or more of a prison sentence, shall, by 1993, serve at least one-half of [their] sentence." (Senate Session Transcript of May 5, 1990 at 2-3.) His remarks reflect the intention behind the bill to increase prisoners' time served behind bars, notwithstanding the Act's establishment of a parole system. Likewise, Representative Tulisano, who also spoke on behalf of the Act, decried the Commissioner's routine use of supervised home release, stating that "the bill attempts to reverse the trend of . . . increasing reliance on the Supervised Home Release Program and the problems we have all encountered with regard to the limited time some individuals are serving." (House Session Transcript of May 9, 1990 at 1.) Representative Tulisano also stated that "one of the reasons why this legislation is before us [is] so that over the period of working time, we will be able to keep more of the individuals who obviously have been problems in for a longer period of time than they currently are." (Id. at 14.)

The Commissioner presently refuses to consider Connelly for early release pursuant to Conn. Gen. Stat. § 18-100(e)(1989) because she takes the position that the Act divested her of authority to do so.

## ARGUMENT

I.    **Summary Judgment Standard**

Summary judgment is proper only if the Court concludes both that (1) there is no genuine issue of material fact, and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Even where there are no material facts in dispute, the court

71406066.4

should nonetheless deny summary judgment when a movant sets forth a flawed legal theory that does not entitle him to judgment as a matter of law. See Proctor & Gamble Indep. Union of Port Ivory v. Proctor & Gamble Mfg. Co., 312 F.2d 181, 190 (2d Cir. 1962) (reversing summary judgment because breach of contract theory was flawed as a matter of law).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion[.]" Celotex v. Catrett, 477 U.S. 317, 324 (1986). In considering a motion for summary judgment the court should confine itself to only those bases raised in the motion and supporting memorandum of law. See Keywell Corp. v. Piper & Marbury, LLP, No. 96-CV-0660E (Sc), 1999 U.S. Dist. LEXIS 1445, *14-15 (W.D.N.Y. Feb. 11, 1999).

## II. The Threshold Issues Raised By The Commissioner Are Either Flawed Or Irrelevant.

Though she includes them in her brief as alternatives to her primary argument, the Commissioner raises a number of arguments that are appropriately regarded as threshold issues. For this reason, we address them at the outset. Whether these arguments derive from the Commissioner's misapprehension of Connelly's claims or otherwise, they deserve short shrift.

### A. Connelly's Claim Presents a Federal Question Over Which This Court Has Jurisdiction

Connelly brings his claim pursuant to § 1983 for deprivation of his rights under the Ex Post Facto Clause of the U.S. Constitution. Momentarily putting the merits of the claim to the side, this claim is cognizable in this Court. E.g., Pennhurst State School &

Hosp. v. Halderman, 465 U.S. 89, 201 (1984) (suits challenging the constitutionality of official state action are not barred by the Eleventh Amendment).

The Commissioner nevertheless asserts that "[w]hatever this case may be, it certainly is not a case alleging a violation of a federally protected right" because Connelly has no "right" to be considered for community release and no "liberty interest" in parole, community release, or where his sentence is served. (Brief at 9-16.) The Commissioner additionally asserts that Connelly's claim is essentially a request to have his risk level classification changed, which, as a purely administrative matter, cannot support an Ex Post Facto Clause claim. (Brief at 16.) These arguments miss the mark entirely.

### 1.      Connelly Asserts An Ex Post Facto Clause Claim.

According to the Supreme Court, "two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." Weaver v. Graham, 450 U.S. 24, 31 (1981)  The Act's elimination of early release to a community residence is retrospective in application.  Indeed, the structure of the Act, as amplified by the remarks of Senator Blumenthal and Representative Tulisano, demonstrate that the legislature intended the Act to apply to inmates whose crimes were committed before its passage. (Senate Session Transcript of May 5, 1990 at 2-3, House Session Transcript of May 9, 1990 at 1.)  Moreover, the Commissioner claims precisely that the Act applies to Connelly, whose offenses were committed before the passage of the Act.  Thus, the sole question is whether the elimination of community release disadvantages Connelly.

71406066.4

The Supreme Court has determined that an inmate may be disadvantaged by changes in statutes that govern community release. Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 519 (1995). In particular, "an increase in punishment occurs when the State deprives a person of the opportunity to take advantage of provisions for early release" and an inmate is "disadvantaged by the reduced opportunity to shorten his time in prison." Id. (internal quotations omitted). Inmates are disadvantaged by the elimination of the opportunity for early community release because the experience of community release is "very different from that of confinement in prison." Morrissey v. Brewer, 408 U.S. 471, 482 (U.S. 1972).

Because this case is precisely about a statutory change that Connelly contends increased his punishment retroactively, the Ex Post Facto Clause is directly implicated.

a.    Due Process Is Not The Issue.

If Connelly were seeking Due Process relief, an analysis of vested liberty interests would be appropriate. Connelly does not seek Due Process relief, however. Connelly asserts that the portion of the Act that eliminated community release violates the Ex Post Facto Clause. Thus, the vested right concept is irrelevant.

Indeed, in a case cited by the Commissioner, the Connecticut Supreme Court recognized that "a law need not impair a vested right to violate the *ex post facto* prohibition." Baker v. Commissioner of Correction, 281 Conn. 241, 261 (Conn. 2007). Thus, the Connecticut Supreme Court found no conflict between its decision in Baker, in which the lower court was found to have had no jurisdiction to hear a due process challenge to the application of parole eligibility guidelines, and earlier decisions that

-11-

found lower court jurisdiction to hear Ex Post Facto Clause challenges to the same guidelines. Id.

      b.     Administrative Discretion Does Not Bar Connelly's Claim.

Connelly's claim is not that he should have his risk-level classification changed. The Act purports to prevent him from being released to the community no matter what his classification may be and no matter how the Commissioner might choose to exercise discretion. Connelly does not ask the Court to order his release, nor to influence the Commissioner's discretion, but only to direct the Commissioner to stop stonewalling.

"[T]he presence of [administrative] discretion does not displace the protections of the *Ex Post Facto* Clause" because the "controlling inquiry . . . [is] whether retroactive application of the change in [the] law creates a sufficient risk of increasing the measure of punishment attached to covered crimes." Johnson v. Commissioner of Correction, 258 Conn. 804, 818 (Conn. 2001) (quoting Garner v. Jones, 529 U.S. 244, 250)(internal quotations omitted). As the Connecticut Supreme Court observed in Johnson, "even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the [Ex Post Facto] Clause if it is both retrospective and more onerous than the law in effect on the date of the offense." Johnson, 258 Conn. at 817. Thus, the mere fact that the decision whether to grant community release implicates administrative discretion does not prevent this Court from determining whether the Act violates Connelly's constitutional rights.

      c.     Connelly's Claim Is Not Barred By *Pennhurst.*

The Commissioner's assertion of the 11th Amendment as a defense to Connelly's claim is a red herring. Because Connelly's claim is brought under the U.S. Constitution

pursuant to § 1983, the 11th Amendment is not implicated. Pennhurst, 465 U.S. at 102 (suits challenging the federal constitutionality of a state official's action are not barred by the Eleventh Amendment.) While federal district courts generally lack jurisdiction to adjudicate claims that seek to order state officials to follow state laws, where the claim is that the state action violates the U.S. Constitution the Court has recognized an important exception to this general rule. Ex Parte Young, 209 U.S. 123 (1908) (federal court enjoined Attorney General from bringing suit to enforce a state statute that allegedly violated the Fourteenth Amendment). According to the Supreme Court, an unconstitutional enactment is "void" and therefore does not "impart any immunity from responsibility to the supreme authority of the United States." Id. at 160.

In Pennhurst, the Supreme Court recognized that "the Young doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to "the supreme authority of the United States." Pennhurst, 465 U.S. at 106. In this case, Connelly properly asks the Court to direct the Commissioner not to invoke the repeal by the Act of her community release program authority, as that portion of the Act is unconstitutional as applied to him.

## 2.    Connelly's Ex Post Facto Claim Clause Is Not Moot.

The Commissioner incorrectly asserts that Connelly's claim was "mooted" by the passage of the Act, which she asserts eliminated the community release program. (Brief at 19.) To the contrary, the Act simply purported to terminate the Commissioner's discretion to release additional prisoners to the community. Indeed, hundreds of prisoners who had been released prior to July 1, 1993 remained in the community

thereafter. If this portion of the Act is declared unconstitutional as applied to Connelly, the Commissioner's discretion will simply no longer be restrained.

Most of the cases on which the Commissioner relies are entirely inapt. She cites, for example, several Supreme Court and Second Circuit decisions that simply discuss the concept of mootness generally or in unrelated circumstances. County of L.A. v. Davis, 440 U.S. 625 (1979) (claim moot where challenged conditions had changed and were unlikely to recur); Spencer v. Kemna, 523 U.S. 1 (1998) (habeas claim mooted by completion of prison term); Martin-Trigona v. Shiff, 702 F.2df 380 (2d Cir. 1983) (issue not found moot); In re: Chateaugay Corp., 10 F.3d 944 (2d Cir. 1993) (appeal of bankruptcy plan moot in part, where plan largely already consummated); In re: Kurtzman, 194 F.3d 54 (2d Cir. 1999) (appeal of order denying appointment of counsel became moot when trustee appointed alternate counsel).

In Wylie v. Warden, 33 Conn. App. 902 (Conn. App. Ct. 1993), however, the Connecticut Appellate Court dismissed as moot a case in which the plaintiff claimed that the Act violated the Ex Post Facto Clause. As Connelly does here, the plaintiff in Wylie challenged the portion of the Act that eliminated community release, as applied to him. Id. The entire rationale of the Wylie court is found in a single sentence of its terse decision: "Since there is no longer any authority for the commissioner of correction to release any prisoner from confinement to an approved community residence, this court can no longer grant the petitioners any practical relief." Id. The court did not disclose any analysis. Nor did the court cite any authority other than Shays v. Local Grievance Committee, 197 Conn. 566, 574 (Conn. 1985), where the Connecticut Supreme Court

-14-

dismissed a writ of error as moot because the contempt sanction under appeal had been fully served.

Wylie, which is not binding on this Court, (CITE), cannot correctly stand for the proposition for which the Commissioner cites it, that the very law challenged as unconstitutional can moot the challenge. If Wylie had this effect, the Ex Post Facto Clause would be an empty promise.

### 3.    Connelly Has Standing.

The Commissioner asserts that Connelly lacks standing because he was sentenced and remanded to the custody of the DOC after the Act became law. As she concedes, however, the Ex Post Facto Clause attaches as of the date of Connelly's offense, not as of the date of his sentencing or incarceration. (Brief at 5-6.) Connelly is therefore precisely in the class of inmates who were harmed by the Act. The fact that Connelly was "on notice" of the Act when he exercised his constitutional right to trial years after his offense is irrelevant.

To the extent the Commissioner claims that the possibility of Connelly's release is remote and speculative even if the Act is unconstitutional, the argument begs the question. Contrary to the Commissioner's assertion, prior to the Act, not only did the Commissioner of Correction have discretion to release an inmate like Connelly to the community, the discretion to release inmates was routinely exercised, as we discuss next.

### III.    The Act Retroactively Increased Connelly's Punishment By Delaying The Possibility Of Release To The Community

Turning to the Ex Post Facto Clause analysis, the Commissioner asserts that the Act did not disadvantage Connelly because it merely substituted parole for community release, thereby changing the procedures by which a convicted offender might be

-15-

71406066.4

released to the community. (Brief at 7.) She claims both that (a) the Act deprived Connelly merely of a speculative opportunity to be released early and (b) the parole system established by the Act in lieu of community release actually operates to Connelly's advantage because Connelly is eligible for parole in November 2009, whereas, purportedly, under the 1989 DOC eligibility criteria, Connelly could not be considered for community release until January 2015 (30 months from his estimated release date). (Id. at 8.) While it is undisputed that Connelly is eligible for parole in November 2009, there is a genuine dispute whether Connelly would be released today but for the Act.

The dispute concerns whether Connelly is eligible for community release under 1989 criteria. Pursuant to Conn. Gen. Stat. § 18-100(e)(1989), "If the commissioner of correction deems that the purposes of this section may thus be more effectively carried out, he may transfer *any person* from one correctional institution … to an approved community residence…" (emphasis added). Thus, the Commissioner had statutory discretion to release an inmate like Connelly.

The Commissioner nevertheless takes the position that Connelly would not have been eligible for release because he did not meet the written eligibility criteria in the DOC's internal guidelines; more specifically, Connelly purportedly fails to meet but a single eligibility criterion in the 1989 written guidelines, that an inmate be within 30 months of his estimated release date. (There is no dispute that Connelly meets all of the other eligibility and suitability criteria.) The evidence, however, demonstrates that this criterion is not an obstacle to Connelly's release. That is, the written eligibility criteria were frequently waived, such that the actual eligibility *requirements* were more liberal.

71406066.4

In her moving papers, the Commissioner asserts that the time-to-release eligibility criterion was never waived. (<u>E.g.</u>, Brief at 3.) To the contrary, however, as shown above:

- each of the eligibility criteria has been waived, including, specifically, the time-to-release criterion;

- the criteria were waived frequently in the aggregate (in 70% of anecdotal cases); and

- at least some of the criteria were even subject to system-wide blanket waivers. Indeed, even the "requirement" that inmates serve at least 10% of their sentences was subject to blanket waiver. (Levesque Dep. at 22.)

Moreover, notwithstanding the Commissioner's assertion that only inmates within the time-to-release guideline were on the list from which inmates were considered for release, the example of Daryl Setzer demonstrates three times over that others were considered.

The Commissioner further asserts that whether to release an eligible inmate was entirely a matter of discretion. However, the Commissioner quite frequently exercised discretion to release inmates to the community. As the remarks of Senator Blumenthal and Representative Tulisano demonstrate, the Act was passed precisely to cabin the Commissioner's routine exercise of discretion to release inmates before they had served even half their sentences. Indeed, even within a tiny anecdotal population, the Commissioner released multiple inmates who had committed offenses on prior release, including escape. Moreover, the Classification Manual gave the Commissioner the right to override the 30-month time to release criteria on an inmate-by-inmate basis. Even

-17-

Case 3:00-cv-00720-JCH    Document 144    Filed 09/12/2007    Page 18 of 23

Asherman, an exceedingly violent criminal who was subsequently denied parole by the parole board, was released to the community by the Commissioner – an irony indeed, given the Commissioner's argument that Connelly is advantaged by the availability of parole. Finally, even in Connelly's specific case, given the opportunity to state unequivocally that she would not exercise her discretion to release Connelly if given the power to do so, the Commissioner instead stated under oath that she would consider what to do after the power was granted. Accordingly, Connelly is gravely disadvantaged by the Act.

Finally, the Commissioner relies on <u>Schildge v. Commissioner of Correction</u>, 1991 Conn. Super. LEXIS 1802 (Conn. Super. Ct. July 31, 1991) for the proposition that even the certain loss of community release is not a material disadvantage. In <u>Schildge</u>, the court concluded that it was constitutional to foreclose community release for certain classes of inmates because an "inmate who is in supervised home release remains in the custody and control of the Commissioner." <u>Id.</u> at *19. The "logic" is entirely flawed: an inmate who is placed in solitary confinement also remains in the Commissioner's control, but no one can dispute that the inmate is disadvantaged. The <u>Schildge</u> decision, which is not binding in this Court, is directly contrary to subsequent U.S. Supreme Court authority, which established that "an increase in punishment occurs when the State deprives a person of the opportunity to take advantage of provisions for early release. <u>Morales</u>, 514 U.S. at 519. Plainly, Connelly is "disadvantaged by the reduced opportunity to shorten his time in prison." <u>Id.</u> (internal quotes omitted).[7]

---

[7] For the same reasons, the Commissioner's analogy to a prisoner incarcertaed in one location versus another is poor, even if her Due Process analysis were relevant. (Brief at 14-16.)

71406066.4

[The remainder of the brief argues, alternatively, (1) that OCM 1989 is not authentic, (2) that Gen. Stat. 18-100(e)(1989) and AD 1.6 are controlling, (3) that the legislature intended sections 18-100(e) and 54-125a to coexist and they coexist to this day and are not mutually exclusive and (4) regardless of the authenticity of OCM 1989, the common practice of override and the commissioner's blanket authority to make an exception to any provision of the directive or manual allow the commissioner release to the plaintiff to the community.]

**IV. The purported Objective Classification Manual of 1989 is not authentic on its face and fails to meet the formatting requirements of AD 1.3, Administrative Directives, Manuals, Form Management and Post Orders.**

OCM 1989 does not resemble other official DOC documents and does not meet the formatting requirements of AD 1.3, Administrative Directives, Manuals, Form Management and Post Orders. There is no accountability as neither the commissioner nor an appropriate Unit Head has signed the document. The date is inserted in a haphazard manner. It is not clear whether it is being passed off as a directive or a manual. It is not designated according to chapter number, directive number or subsection. The headings do not comply with the provisions of AD 1.3, sections 6A and 6B. There is no transmittal memorandum authenticating the document pursuant to section 19. Regardless of whether OCM 1989 is deemed a directive or a manual, it is not consistent with the format established in sections 5 through 7 of AD 1.3. See plaintiff's exhibit E, especially sections 3-7, 19 and 26.

**V. Gen. Stat. 18-100(e)(1989) and AD 1.6 are controlling.**

Section 18-100(e)(1989) authorizes the commissioner, inter alia, to release any person to any public or private nonprofit halfway house or to an approved community residence. There are no provisions limiting release to persons within 30 months of estimated release or discharge date nor are there any other provisions informing or restricting the discretion of the commissioner. See plaintiff's exhibit A.

AD 1.6 does not limit release to persons within a specified period from estimated or discharge date. An inmate may initiate and participate in early release and other reclassification decisions as provided by sections 4A, 5B, 5D and 6. See plaintiff's exhibit B. AD 1.6 is the Classification Administrative Directive in effect on the date of the crime, November 10, 1989. See plaintiff's exhibit J. The commissioner in her deposition emphasizes the primacy of statutes, then directives. Plaintiff's exhibit K.

**VI. Sections 18-100(e)(1989) and 54-125a are not mutually exclusive.**

PA 90-261 went beyond merely reinstating parole definite sentences. PA 90-261 also amended section 18-100(e) and related statutes pertaining to nonparole release to the community. See plaintiff's exhibit C, G. The minimum to be served under section 18-100(e) progressed from no percentage stipulated to 25% to 40%. PA 90-261 did not provide that an inmate applying for nonparole release be within 30-36 months of estimated or discharge date. See plaintiff's exhibits A, B, C. After the effective date of PA 90-261, releases continued under both schemes.

See Lee Aff., Table A. Sections 18-100(e) and 54-125a coexist to this day. See plaintiff's exhibit D; PA 04-234.

The plaintiff claims he is currently eligible for department of correction nonparole release pursuant to section 18-100(e)(1989) and in November of 2009 will be eligible for parole release pursuant to section 54-125a. It is clear from P. A. 90-261 that the legislature intended the release schemes to coexist and they coexist to this day. They are not mutually exclusive. See plaintiff's exhibit C; Gen. Stat. 18-100(e)(1989); Gen. Stat. 18-100(e)(2007).

**VII. Regardless of whether OCM 1989 is authentic, the release mechanisms of override and the blanket authority of the commissioner to make exceptions to the directives allow for release of the plaintiff to the community.**

The common practice of override is being given scant attention. Override can reduce the overall risk score without regard to individual criteria. For example, plaintiff Connelly is currently at Level 3 and by override can be reduced to Level 1 without regard to any individual criteria. Even if OCM 1989 were deemed valid, and the plaintiff is not within 30 months of his estimated release date, an override from 3 to 1 is possible; see plaintiff's exhibit F at 40-41; exhibit F, appendix at 2; Lantz Depo. at 28; plaintiff's exhibit G, Tropp draft 56(a)(2) Statement of Disputed Issues. In addition to override, the commissioner has authority to release the plaintiff to the community by exercising her blanket power to make exceptions to the directive. See plaintiff's exhibit H, section 15.

## CONCLUSION

As the Supreme Court has observed, community release would enable the plaintiff "to do a wide range of things open to persons who have never been convicted of any crime ... he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." Morrissey v. Brewster, 408 U. S. 471, 482 (1972). The loss of this opportunity is a clear disadvantage to the plaintiff.

For all of the foregoing reasons, this Court should deny the Commissioner's motion for summary judgment.

22

Respectfully submitted,

William Connelly
#189009
Enfield Correctional Institution
289 Shaker Road
Enfield, CT 06082

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served via First Class Mail, postage prepaid, upon the following counsel for the defendant:

Steven R. Strom, Esq.
Robert B. Fiske, Esq.
Assistant Attorneys General
110 Sherman Street
Hartford, CT 06105

9-6-07