UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM CONNELLY | : | |
|    Plaintiff | : | |
| | : | CIVIL ACTION NO.: |
| v. | : | 3:00-cv-720 (JCH) |
| | : | |
| THERESA LANTZ | : | |
|    Defendant | : | NOVEMBER 2, 2007 |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (Doc. No. 125)**

Plaintiff William Connelly, a state prisoner, brings this § 1983 action based on an alleged violation of the Constitution's Ex Post Facto Clause. See U.S. Const. art. I., § 10. Connelly's claim stems from a Connecticut statute, Public Act 90-261, 1990 Conn. Legis. Serv. 261, that retroactively eliminated the state's Supervised Home Release (SHR) program and replaced it with a system of parole. The defendant corrections commissioner, Theresa Lantz, has moved for summary judgment on Connelly's claim. The court **GRANTS** the defendant's motion.

**I.    SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. Rivkin v. Century 21 Teran Realty LLC, 494 F.3d 99, 103 (2d Cir. 2007). However, a party may not rely simply on speculation or conjecture to defeat summary judgment. Bridgeway Corp. v. Citibank, 201 F.3d 134, 143 (2d Cir. 2000). Instead, the party must actually introduce evidence that is sufficient to create a disputed issue of

1

material fact.  Id.

## II. BACKGROUND[1]

### A. Connecticut's Sentencing Laws

Over the last three decades, Connecticut's sentencing system has undergone significant changes.  Before 1981, convicted criminals were sentenced to "indeterminate" sentences that specified both a maximum and minimum term.  See Conn. Gen. Stat. § 53a-35 (imposing the old indeterminate sentencing regime for crimes committed prior to July 1, 1981).  Once a criminal had served his minimum term, he became eligible for consideration for parole.

In 1981, Connecticut switched to a scheme of determinate sentencing in which offenders were given a fixed term of imprisonment.  See id. § 53a-35a.  Until 1990, however, parole did not exist for these offenders.  Instead, the state Department of Correction (DOC) was given discretion to grant prisoners "early release."  Specifically, Connecticut law provided that:

> the commissioner of correction . . . may transfer any person from one correctional institution to another or to any public or private nonprofit halfway house, group home or mental health facility, or to an approved community residence with the concurrence of the warden, superintendent or person in charge of the facility to which said person is being transferred.  Any inmate so transferred shall remain under the jurisdiction of said commissioner. Any inmate transferred to an approved community residence shall also be subject to specifically prescribed supervision by personnel of the department of correction until his definite or indeterminate sentence is completed.

---

[1] Given the procedural posture, the court will describe the introduced evidence in the light most favorable to Connelly.

Conn. Gen. Stat. § 18-100(e) (1989).

Embedded within this statutory authority for early release was language allowing for placement in an "approved community residence." Id. This language authorized DOC to administered the SHR program, which allowed individuals to be released to private residences in the community. See, e.g., Asherman v. Meachum, 932 F.2d 137, 139 (2d Cir. 1991) (describing an individual released under the SHR program in 1988).[2]

In 1990, the Connecticut legislature passed Public Act 90-261 ("P.A. 90-261"). This statute revised early release by eliminating the possibility of placement in a community residence after June 30, 1993. See 1990 Conn. Legis. Serv. 261, §§ 2, 3(e). Simultaneously, however, P.A. 90-261 introduced a system of parole for individuals serving determinate sentences. See id. § 5 (codified as amended at Conn. Gen. Stat. § 54-125a). Thus, as applied to individuals who committed crimes after July 1, 1981, P.A. 90-261 replaced SHR with a system of parole.

As is relevant for present purposes, the new parole system differed in several respects from SHR. SHR was left almost entirely to the discretion of DOC, guided by whatever rules and regulations DOC imposed on itself. See Conn. Gen. Stat. § 18-100(e) (1989). By contrast, P.A. 90-261 placed parole in the hands of the Board of Parole ("Board"), an entity that was separate from DOC in 1990, and that is still largely independent today.[3] Furthermore, although the Board was given significant discretion

---

[2] As the Asherman case also illustrates, individuals who committed crimes before 1981 were eligible for both SHR and parole until SHR was eliminated.

[3] In 1990, the Board consisted of eleven members appointed by the Governor and confirmed by either house of the legislature. See Conn. Gen. Stat. § 54-124a (1990). Regular members served four year terms, and their salary was fixed by statute.

in granting parole, P.A. 90-261 barred parole for individuals who had served less than 50% of their sentences. 1990 Conn. Legis. Serv. 261, § 5. The statute also directed that inmates not be paroled unless:

> (1) [I]t appears from all available information, including any reports from the commissioner of correction that the [Board] may require, that such inmate will live and remain at liberty without violating the law, and
> (2) [S]uch release is not incompatible with the welfare of society.

Id. If parole was granted, the parolee was authorized be placed "in his home or . . . in a residential community center, or . . . elsewhere," id., at the discretion of the Board. For Connelly, the parole provisions of P.A. 90-261 are still in effect in essentially unchanged form.[4] See Conn. Gen. Stat. § 54-125a.

One of the key reasons for the legislature's shift from SHR to parole was a perception that SHR allowed inmates to be released upon serving as little as 10% of their sentences. Rep. Tulisano, the chief proponent of the bill in the House, explained to his colleagues that the "bill attempts to . . . reverse the trend of [DOC's] increasing reliance on the [SHR] Program and the problems we have all encountered with regard

---

Id. The Chairman's salary was set by the Commissioner of Administrative Services. Id. Currently, the Board has thirteen members, and the Governor must make appointments to the Board that reflect the racial diversity of the state. Conn. Gen. Stat. § 54-124a(a) (2007). All appointments to the Board expire at the end of the Governor's term. Id. § 54-124a(b). Although the Board is still largely separate from DOC, it is deemed to be within DOC "for administrative purposes only." Id. § 54-124a(a).

[4] A later amendment required individuals convicted of certain serious crimes to serve 85% of their sentences, rather than 50%. Although the text of the amendment might seem to apply to Connelly, the Connecticut Supreme Court held that the amendment was not retroactive. See Johnson v. Comm'r of Corr., 786 A.2d 1091, 1106 (Conn. 2002).

to the limited time some individuals are serving after being sentenced." H.R. Proc., 1990 Sess., at 10335-36 (Conn.). He argued that the bill solved this problem because it eliminated SHR and replaced it with a system of parole that required individuals to serve at least 50% of their sentence. Id. Rep. Tulisano and his colleagues appear to have been reacting to evidence that overcrowding pressures forced DOC to use the SHR program more liberally than the legislature wanted.[5]

Notwithstanding the passage of P.A. 90-261, these pressures apparently continued to be a problem that needed to be addressed. Indeed, in 2004 the legislature authorized a community release program that was reminiscent of the defunct SHR program. See An Act Concerning Prison Overcrowding, 2004 Conn. Legis. Serv. 234, § 30 (codified at Conn. Gen. Stat. § 18-100(e)). Connecticut law now permits DOC to transfer an inmate "to any approved community or private residence" after "satisfactory participation in a residential program." Conn. Gen. Stat. § 18-100(e) (2007).[6]

---

[5] During committee hearings, several state officials testified that capacity problems had caused DOC to use the SHR program as a safety valve; in some cases individuals were being released who had served as little as 10% of their sentences. See Hearing on S.B. 468, Conn. Joint Standing Comm. on Judiciary, 1990 Sess., at 1100-01 (statement of Jack Kelly, Chief State's Att'y); id. at 1117-19 (statement of William Carbone); id. at 1135-39 (statement of Larry Meachum, Comm'r of the Department of Corrections).

[6] The current version of section 18-100(e) reads in full:

> If the Commissioner of Correction deems that the purposes of this section may thus be more effectively carried out, the commissioner may transfer any person from one correctional institution to another or to any public or private nonprofit halfway house, group home or mental health facility or, after satisfactory participation in a residential

5

B. <u>Connelly's Crime</u>

On November 10, 1989, Connelly was involved in a shooting and hostage incident with his two brothers. He was arrested several days later for kidnaping and assault, and was in pretrial custody from November 13, 1989 until April 20, 1990. Connelly was then tried in state court, where he was found not guilty by reason of insanity. He was thereafter committed to a mental health facility.

Connelly was later able to vacate the judgment against him, and he was retried in January 1995. He was found guilty of two counts of kidnaping in the second degree and two counts of assault in the second degree. Pursuant to this verdict, the state court sentenced Connelly to a definite term of 40 years imprisonment. Connelly's time in mental health commitment has been credited against this sentence. See <u>Connelly v. Comm'r of Corr.</u>, 780 A.2d 903 (Conn. 2001).

Connelly is currently serving his sentence at the Enfield Correctional Institute. DOC estimates that Connelly will be released on January 5, 2018 or sometime in July 2016 (the exact date depends on the extent to which Connelly continues to earn good time credits). DOC also acknowledges that Connelly could be released on parole at an earlier date, and it puts November 2009 (<u>i.e.</u> the date at which Connelly will have served at least 50% of his 40-year sentence) as the date when he is first eligible for parole.

---

program, to any approved community or private residence. Any inmate so transferred shall remain under the jurisdiction of said commissioner.

Conn. Gen. Stat. § 18-100(e) (2007).

C. Procedural History

On February 1, 2000, Connelly wrote to the DOC requesting that he be considered for early release "according to the statutes, directives, policies, procedures, and guidelines in effect on November 10, 1989." Connelly Exh. L. That request was denied. Connelly nonetheless persisted in his application, and on October 20, 2003, a DOC official sent Connelly an official letter again denying Connelly's request. The letter noted that, under then-current DOC policy, inmates were ineligible for early release unless they were within 18 months of their estimated discharge date or voted to parole date. The letter explained that Connelly "was not currently eligible for early release" pursuant to Conn. Gen. Stat. § 18-100, as Connelly was not within 18 months of either date.

This denial letter was written in 2003, before the legislature's 2004 decision to reauthorize community release. However, as evidenced by its Administrative Directive 9.2, DOC still uses an 18-month cutoff before considering inmates for early release. This 18-month cutoff differs from the 30-month cutoff for SHR that was in effect in 1989.[7]

On January 29, 2007, Connelly filed a Third Amended Complaint. This

---

[7] The 30-month cutoff is contained in the DOC's 1989 classification manual. See Lantz Exh. E. Connelly argues that the 1989 manual is not "authentic" because it does not meet the formatting requirements of the DOC, as laid out in the DOC's Administrative Directive 1.3. However, Connelly has only provided the court with the 2005 version of A.D. 1.3. This is not sufficient to created a disputed issue of material fact that the 1989 manual is "inauthentic." In any event, even if the 1989 manual were deemed "inauthentic," that fact would have no bearing on the outcome of this case.
    Relatedly, Connelly argues that the 30-month cutoff was sometimes disregarded by DOC. But in light of the court's analysis below, that fact also has no bearing on the outcome of the case.

7

Complaint, prepared with the assistance of counsel, articulated a single claim: that the application of P.A. 90-261 to Connelly constituted a violation of the Ex Post Facto Clause. As relief, Connelly requested a declaratory judgment as to the constitutionality of P.A. 90-261, as well as an injunction requiring Lantz to consider Connelly's application for early release "under the rules, regulations, directives, guidelines, standards, policies and customs in effect on November 10, 1989." Doc. No. 120 at 6.

Lantz filed a Motion for Summary Judgment on June 26, 2007. Approximately one month later, before Connelly had filed any response, Connelly informed the court that he had discharged his pro bono counsel. Doc. No. 131. At the time Connelly ultimately submitted his opposition -- September 12, 2007 – he was proceeding pro se.

## III. DISCUSSION

### A. Threshold Issues

Before it can consider the merits of Connelly's claim, the court must first deal with several jurisdictional challenges raised by Lantz. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-94 (1998); Brooklyn Legal Servs. Corp. B v. Legal Servs. Corp., 462 F.3d 219, 234 (2d Cir. 2006). These challenges are without merit.

First, Lantz argues that Connelly's claim is barred by the Eleventh Amendment as interpreted in Pennhurst State School & Hospital v. Halderman, 465 U.S. 89 (1984). See id. at 100, 121 (stating that federal courts lack jurisdiction to hear claims that a state official is violating state law). This argument is without merit because Connelly's sole claim is based on the federal constitution's Ex Post Facto Clause. Although Connelly may be seeking an injunction whose effect would be to force a state official to apply a state law (that has subsequently been repealed), that is irrelevant. Once a

8

state official is determined to be acting unconstitutionally, that official no longer represents the state, and the Eleventh Amendment ceases to protect that official against suits for injunctive relief. See id. at 104-05.

Lantz next argues that the case is moot because the SHR program has been eliminated and thus Connelly cannot obtain any relief. Lantz correctly points out that a case is moot when a plaintiff's injury is unlikely to be redressed by a favorable judicial decision. See Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477-78 (1990)) (internal quotation marks omitted). However, Connelly's injury is likely to be redressed if he can obtain a favorable judgment. Even though SHR no longer exists, the court has the power to order Lantz to consider Connelly for community release. Furthermore, the court has the power to order Lantz to develop an appropriate release program for Connelly should he be deemed qualified for community release.[8] The fact that SHR does not currently exist is not an obstacle to these court orders.

Finally, Lantz asserts that Connelly lacks standing to pursue his claim. In order to have standing a plaintiff must (among other requirements) have suffered "some actual or threatened injury." Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464, 472 (1982). Despite Lantz's contrary protestations, Connelly meets this test. His claim is that DOC is unconstitutionally refusing to

---

[8] A Connecticut appellate court has apparently concluded that the elimination of SHR has rendered moot any attempts to force DOC to consider an inmate for SHR. See Wylie v. Warden, 632 A.2d 1133, 1134 (Conn. Ct. App. 1993) (per curiam). This per curiam opinion offered little in the way of analysis, and the court does not find it persuasive.

9

consider him for SHR, thereby reducing his chances at obtaining community release. That is an actual or threatened injury.

Lantz responds by suggesting that it is extremely speculative whether Connelly has actually been harmed by this lost opportunity, and so she contends that this injury is too remote to support standing. This misconceives Connelly's claim. The injury Connelly is claiming is his lack of <u>opportunity</u> to be considered for community release. See Garner v. Jones, 529 U.S. 244, 254 (2000) (explaining that the Ex Post Facto Clause prevents states from making retroactive changes that create a "significant risk" of increasing the criminal's punishment). Lantz's argument goes to the merits of Connelly's claim, rather than his standing to make the argument.[9]

Having disposed of these threshold issues, the court will proceed to the merits.

B.   Ex Post Facto Claim

Article 1, § 10 of the Constitution prevents states from enacting any "ex post facto Law." As the Supreme Court has interpreted this phrase, there are four categories of ex post facto laws:

> 1st. Every law that makes an act done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence

---

[9] Lantz also argues that Connelly lacks standing because he was not in DOC's custody when P.A. 90-261 took effect. But Connelly's physical placement at that time is irrelevant. What <u>is</u> important is that P.A. 90-261 had retroactive effect that allegedly affected Connelly.

10

in order to convict the offender.

Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798); see also Stogner v. California, 539 U.S. 607, 610-16 (2003) (continuing to look to the Calder categories as authoritative).

Connelly's claim falls squarely within the third category. He argues that when the legislature retroactively "eliminated" his opportunity for community release, and replaced it with a system of parole that required offenders to serve at least 50% of their sentences, the legislature impermissibly increased the punishment that attached to his crimes.

This type of claim is governed by the framework established in Garner and California Department of Corrections v. Morales, 514 U.S. 499 (1995). The controlling question is whether retroactive application of the new law "created 'a sufficient risk of increasing the measure of punishment attached to the covered crimes.'" Garner, 529 U.S. at 250 (quoting Morales, 514 U.S. at 509). Some legislative changes are so innocuous that they are not of "sufficient moment" to constitute an ex post facto violation. Lee v. Governor of the State of N.Y., 87 F.3d 55, 59 (2d Cir. 1996) (quoting Morales, 514 U.S. at 509) (internal quotation marks omitted).

Connelly's case is a prime example of such an innocuous change. In light of the 2004 amendment, Connecticut now authorizes DOC to place individuals in community and private residences, just as it did in 1989.[10] Compare Conn. Gen. Stat. § 18-100(e) (1989) with Conn. Gen. Stat. § 18-100(e) (2007). The only difference is that the

---

[10] Connelly largely ignores the 2004 amendment, preferring instead to focus the court's attention on the changes wrought by P.A. 90-261. However, Connelly has sought prospective relief only, and it is therefore irrelevant whether he suffered an ex post facto violation prior to 2004.

11

current statute requires that inmates be given a "residential placement" prior to being placed in a community or private residence, whereas the old statute had no such requirement.[11]

As a facial matter, a temporary residential placement (i.e., an interim placement that is still outside the prison walls) is not sufficiently more onerous than an SHR placement so as to give rise to an ex post facto claim. Indeed, this case is at least facially similar to Lee, in which the Second Circuit concluded that the elimination of a work release program for certain offenders was not significant enough to rise to an ex post facto violation. 87 F.3d at 59-60. Like the rule change in Lee, the change here does not appear to actually lengthen the convict's sentence; it simply imposes a small degree of increased supervision. See id. at 59-60; see also Rooney v. North Dakota, 196 U.S. 319, 326 (1905) (finding no ex post facto problem when a law retroactively replaced "confinement in the county jail" with "close confinement in the state penitentiary" for prisoners awaiting a death sentence); cf. In re Medley, 134 U.S. 160, 167-171 (1890) (finding an ex post facto violation when a law retroactively required death row inmates to be placed in solitary confinement until their execution).

This is not to say that it would be impossible for a residential placement to be sufficiently more punitive than SHR so as to give rise to an ex post facto claim.

---

[11] Arguably, there is one other difference, but this "difference" works in Connelly's favor. The old statute specifically stated that an individual placed in a community residence would be "subject to specifically prescribed supervision by personnel of the department of correction until his definite . . . sentence is completed." Conn. Gen. Stat. § 18-100(e) (1989). The new statute does not contain any such supervision requirement. See Conn. Gen. Stat. § 18-100(e) (2007).

However, Connelly has introduced absolutely no evidence on this point at all.[12] Without such evidence, any claim to this effect "rests upon speculation," Garner, 529 U.S. at 256, and cannot withstand summary judgment.[13]

Moreover, even if there were any doubt on the issue, the court must take into account the fact that P.A. 90-261 gave Connelly the opportunity for parole. See Dobbert v. Florida, 432 U.S. 282, 294 (1977) (explaining that the court must compare the old and the new laws "in toto" to see if the new law "may be fairly characterized as more onerous"). Before P.A. 90-261 was passed, Connelly had only the opportunity to obtain community release. Now, however, Connelly has the opportunity to apply for both community release and parole. If Connecticut's new legal regime is more onerous for Connelly (a questionable proposition), then the degree of extra punishment is surely

---

[12] At oral argument, Connelly argued that, because residential placement spots are limited and have certain sponsorship requirements, some inmates have great difficulty obtaining residential placements. This difficulty could then effectively prevents them from qualifying for community release.

However, Connelly has introduced absolutely no evidence in support of his assertion. Connelly does point to the affidavit of Pei T. Lee, which documents that no inmates have qualified for SHR since the early 1990s. See Lee Aff. exh. D. But that is no surprise, as SHR was abolished in the early 1990s. Indeed, the Lee affidavit also documents that there are now a number of inmates released on "transitional supervision," which is the DOC's current terminology for community release. Id. The Lee Affidavit does nothing to support Connelly's assertion that inmates have had difficulty obtaining residential placements.

[13] Indeed, in Connelly's Opposition to Summary Judgment, he did not argue that a residential placement would be more onerous than community release. Instead, he appears to have taken the position that the community release statute in effect in 1989 is essentially the same as the community release statute in effect today. See Connelly's Mem. in Opp. to Defendant's Mot. for Summ. Judgment at 20-21.

so slight that it cannot be deemed to rise to the level of an ex post facto violation.[14]

## IV. CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment [Doc. No. 125] is **GRANTED**. The Clerk is ordered to close the case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 2nd of November, 2007.

                    /s/ Janet C. Hall
                    Janet C. Hall
                    United States District Judge

---

[14] The court notes one final point. Connelly's Complaint, which was drafted by counsel, did not advance any ex post facto claim with regard to DOC's switch from a 30-month cutoff to an 18-month cutoff in determining eligibility for early release. The sole language in the Complaint that was even remotely on point was one sentence, in the section requesting various forms relief, in which Connelly asked the court to "[e]njoin Commissioner Lantz to consider Mr. Connelly's application for early release under Conn. Gen. Stat. § 18-100(e) under the rules, regulations, directives, guidelines, standards, policies and customs in effect on November 10, 1989." Compl. at 6. This was certainly not sufficient to put the defendant on notice that Connelly was raising an ex post facto claim based on the 18-month versus 30-month issue.

    Connelly's Opposition to defendant's Motion for Summary Judgment also did not raise the issue. Connelly's Opposition does very briefly discuss Administrative Directive 1.6, a directive that Connelly describes as "not limit[ing] release to persons within a specified period from estimated or discharge date." Connelly's Mem. in Opp. to Defendant's Mot. for Summ. Judgment at 20. And he also points out, offhandedly, that A.D. 1.6 was in effect on the date of his crime. Id. This discussion of A.D. 1.6 does not raise the 18-month versus 30-month issue.

    Because Connelly has not properly raised any ex post facto claim with regard to the 18-month versus 30-month change in cutoff times, the court will not address that possible issue.